No.  2--00--0408

     

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

JANE DOE, Individually and as
  )  Appeal from the Circuit Court

Parent and Next Friend of  )  of Du Page County.

John Doe, a Minor,  )

  ) 

Plaintiff-Appellee,  ) 

  ) 

v.  ) No. 96--L--0367

  )

GEORGE WINNY,    ) Honorable

  ) Edward R. Duncan,

Defendant-Appellant.  ) Judge, Presiding.

JUSTICE GEIGER delivered the opinion of the court:

The plaintiff, Jane Doe, individually and as parent and next friend of John Doe, a minor, filed this medical malpractice action against the defendant, George Winny, M.D., and other individuals not relevant to the instant appeal.  The complaint alleged that John Doe was injured by the negligent psychiatric care and treatment provided by the defendant during the minor's 23-day stay at Mercy Hospital in Aurora.  John Doe had been hospitalized after being placed in the custody of the Department of Children and Family Services (DCFS).  DCFS had initiated a child-abuse investigation after receiving a hotline report that John Doe was the victim of sexual abuse.  The defendant filed a motion for summary judgment, claiming immunity under section 9 of The Abused and Neglected Child Reporting Act (the Act) (Ill. Rev. Stat. 1991, ch. 23, par. 2059 (now 325 ILCS 5/9 (West 1996)).  This section immunizes individuals from liability resulting from their good-faith participation in the reporting and the investigation of a claim of child abuse made under the Act.

The trial court denied the defendant's motion for summary judgment, finding that a question of fact existed as to whether the defendant acted in good faith as required under the immunity provisions of the Act.  The trial court, however, certified the following questions for interlocutory appeal under Supreme Court Rule 308 (155 Ill. 2d R. 308):

"[1] Does the good faith immunity provided by 325 ILCS 5/9 shield a physician from liability for his failure to meet accepted medical standards in providing care and treatment to his patient?

[2] Is evidence that a physician failed to meet accepted medical standards sufficient to create a question of fact over whether that physician acted in 'good faith' within the meaning of 325 ILCS 5/9?"

On May 19, 2000, this court denied the defendant's application for leave to appeal pursuant to Rule 308.  On October 26, 2000, the Illinois Supreme Court entered a supervisory order directing this court to address the certified questions.  On November 3, 2000, this court entered an order allowing the defendant's application for leave to appeal.  In addition to the briefs filed by the parties, 
amicus
 
curiae
 briefs have been filed by the Illinois Trial Lawyers Association, the Illinois State Medical Society, and DCFS. 

I.  Background

The following facts appear in the depositions and other exhibits provided by the parties in briefing Dr. Winny's motion for summary judgment.  The plaintiff in this action, Jane Doe, has two children, John Doe and June Doe.  John was born on June 16, 1986, and June was born on October 26, 1987.  Jane is a single parent and has a history of substance abuse and depression.  On October 23, 1989, DCFS received a hotline call from the Woodbridge police department advising it that Jane was hospitalized after attempting suicide.  Following this suicide attempt, John and June had been left in the care of their maternal grandparents.  DCFS provided a child welfare services referral to the family, the purpose of which was to provide support services such as daycare, therapy, and parenting classes.  The case was assigned to DCFS caseworker, John Schweitzer.

In March 1991, Schweitzer received a call from Jane advising him that John was having behavioral problems at home and in school.  She indicated that, based upon the recommendation of her therapist, she was admitting John to Woodland hospital for a three-week inpatient psychiatric evaluation.  At Woodland Hospital, John's attending physician was Dr. Lerwut Wongsarnpigoon.  Dr. Wongsarnpigoon reported that John was overly concerned with death, dying, Jesus, and Satan.  Dr. Wongsarnpigoon suspected that John might have been the victim of some type of abuse.  Karen Hegel, a social worker at Woodland Hospital, reported that John had some bizarre behaviors, including eating feces and hurting others.  Hegel indicated that John acted like a snake and tried to bite people and that he said that he "saw little girls in cages with feces and urine on the floor."

On April 7, 1991, DCFS received a hotline call reporting that John was believed to be a victim of child abuse or neglect.  The case was then assigned to caseworkers Anne Carpenter and Deborah Borrini.  Over the next 36 hours, Carpenter and Borrini interviewed Dr. Wongsarnpigoon, Hegel, Schweitzer, Jane's father, the director of the children's preschool, and two members of the Woodridge police department.  These interviews disclosed that John was self-destructive and had made attempts to poke his own eyes out.  He was obsessed with feces, death, and fears that his mother was going to cut out his heart and kill him.  John also spoke of ghosts, people in robes, and of children standing in a circle, holding hands, and chanting.

After a consultation with Carpenter, the Du Page County State's Attorney agreed to join the investigation and to initiate a shelter-care hearing for the purpose of placing the Doe children in DCFS custody.  On April 11, 1991, the trial court conducted a shelter-care hearing.  At the close of the hearing, the trial court determined that there was probable cause for believing that the Doe children were the victims of abuse and awarded temporary custody of the children to DCFS.  Carpenter advised the trial court that the plaintiff was to be released from Woodland Hospital that day and that Mercy Hospital was willing to accept both children for evaluation.  The trial court inquired as to how long the evaluation would take, and Carpenter indicated that the evaluation would take three weeks.  The trial court determined that such an evaluation would be appropriate.

Immediately after the shelter-care hearing, John and June were admitted into Mercy Hospital through the emergency room.  As the underlying complaint contains no allegations of negligence concerning the treatment received by June, we will focus only upon the treatment received by John.  Defendant Dr. George Winny was the psychiatrist on call when John arrived at the hospital and was the admitting physician.  Dr. Winny admitted John for a three-week inpatient evaluation.  Dr. Winny spent three hours with John the evening he was admitted.  John told Dr. Winny about a man who beat him when his mother was not home and who did things to him in a closet that made him cry.  John said that the man "kissed me in my penis, in my private, he sucked me, he already did that and also on my back, on my butt, he did it all the time."  When Dr. Winny asked John what he meant by his private parts, John opened his clothes, took his penis out, and asked, "Do you want to see my butt?"

Dr. Winny spoke with Carpenter that same evening and advised her that John's admitting diagnosis was posttraumatic stress disorder caused by sexual or physical abuse.  Dr. Winny explained that he had ordered a full battery of psychological testing, as well as play therapy, family therapy, and metaphorical story therapy.  Dr. Winny's immediate objective was to understand the reasons why John was behaving in this particular way.  The initial treatment plan was to evaluate for the possibility of sexual and physical abuse, to stabilize John's behavior, and to get John to talk about his problem in a realistic way.

Carpenter received oral reports from Dr. Winny on April 16, 1991, April 18, 1991, April 25, 1991, and April 29, 1991.  In these reports, Dr. Winny described instances in which John asked members of the hospital staff to "put pointed objects in his butt."  John also attempted to pull down the pants of a therapist during play therapy "in order to kiss her butt."  When playing with a boy doll, John attempted to pull down the doll's pants and then kissed the doll several times in the groin area.  John would also ask to be "shot under [his] butt" and would place himself in a sexually provocative position on his knees, raising the lower portion of his body and his buttocks into the air.

Some of John's behavior during play therapy was videotaped.  In a videotape created on April 23, 1991, John can be seen engaging in play with a female therapist.  John is dressed in a robe and a hat for a make-believe party.  In preparation for the party, John explains that he is making a cake on which he is sprinkling a substance.  John explains that eating the cake "takes him to a carnival" and makes him "do sex."  John is then seen "imprisoning" the therapist by putting a milk crate over her head.  John then attempts to remove the therapist's pants and then exposes himself to her.  Throughout the video, the therapist cries for help from "Mommy," but John tells her that "if you tell Mommy, Mommy would be hurt and dead forever."

John was discharged from Mercy Hospital on May 3, 1991.  Dr. Winny's discharge summary indicated "probable sexual abuse."  However, Dr. Winny did not believe that Jane was involved in the abuse.  Dr. Winny recommended that both John and June be temporarily placed in foster care.  Dr. Winny also recommended intensive therapy for John, preferably through the Child Sex Abuse and Treatment Center in Bollingbrook (CSATC).

On May 8, 1991, the trial court entered an order that the children be placed in foster care and that Dr. Eleanor Ryan perform a psychological evaluation of the children and their mother.  The trial court also ordered that John receive therapy and counseling at CSATC.  Dr. Ryan's ensuing report recommended a six-month separation of the children from their mother and "considerable" treatment for John.  Dr. Ryan opined that John had likely been enticed or coerced into participating in sexual behavior.

DCFS issued its final determination on the case on July 1, 1991.  The findings were that (1) Jane Doe was at risk of causing mental and physical harm to the children; (2) an unknown person was indicated for sexual penetration and molestation of John; and (3) an unknown person was indicated for molestation of June.  DCFS's findings were based, in part, upon Dr. Winny's oral reports and discharge summaries.  Although the record is not entirely clear, it appears that the Doe children remained in foster care until approximately 1994 or 1995.

On April 10, 1996, Jane Doe, individually and as parent and next friend of John Doe, filed the instant medical malpractice action against Dr. Winny and other defendants.  The only count of the complaint concerning Dr. Winny was count V.  The count alleged that Dr. Winny negligently failed to treat John for his actual psychological condition and instead engaged John in a course of therapy that centered upon themes of satanic, physical, and sexual abuse.  Such therapies were alleged to have improperly encouraged John to engage in sexual play and sexual contact with his  therapist.  The complaint also alleged that Dr. Winny failed to properly supervise his medical assistant, who was also conducting therapy upon John.  Finally, the complaint alleged that Dr. Winny wrongfully diagnosed John as having been exposed to physical and/or sexual abuse.  As a result of these omissions, John was alleged to have been deprived of his "proper loving and caring home" when he was separated from his mother for a period in excess of three years.  John's behavior was also alleged to have worsened during Dr. Winny's treatment, necessitating additional lengthy inpatient psychiatric hospitalization.  The complaint alleged that John's mental well-being was permanently harmed and damaged by Dr. Winny's treatment.

As noted above, Dr. Winny sought summary judgment based upon section 9 of the Act (325 ILCS 5/9 (West 1996)), which provides good-faith immunity from civil liability to individuals who report or investigate a report of child abuse pursuant to the provisions of the Act.  In response, the plaintiff argued that Dr. Winny's liability was predicated upon the negligent administration of psychiatric care, as opposed to his participation in the child abuse investigation.  The plaintiff argued that liability for medical malpractice is not immunized under the Act.  Attached to her response, the plaintiff filed the affidavit of Dr. John Cannell, a California-based psychiatrist.  Dr. Cannell opined that Dr. Winny had rendered "treatment" to John and did not merely "evaluate" him.  Dr. Cannell also stated that Dr. Winny deviated from the standard of care by "failing to adequately observe, supervise, and monitor the care rendered to John."

On January 11, 2000, the trial court denied Dr. Winny's motion for summary judgment.  Without determining whether Dr. Winny's conduct fell within the scope of the immunities provided under section 9 of the Act, the trial court found that Dr. Cannell's criticisms presented a question of fact as to whether Dr. Winny acted in "good faith" as required under section 9.  The trial court explained:

"As I read the definition of good faith, that good faith is adhering to one's standard obligation or duty and extending that concept to a doctor would be to--to conduct oneself within reasonable professional standards.  I don't think that the statute should insulate someone who is alleged to have performed his professional obligation at a level below accepted medical standards."

At the request of Dr. Winny, the trial court certified the two legal questions noted at the outset.

II.  Discussion

The first certified question asks whether the immunity provided by section 9 of the Act shields a physician from liability for his failure to meet accepted medical standards in providing care and treatment to his patient.  The plaintiff argues that section 9 does not immunize a physician for negligent care and treatment; rather, the plaintiff asserts that section 9 immunizes a physician only from liability resulting from his good-faith participation in the making of a report of child abuse and the investigation of such a report.  Dr. Winny, on the other hand, argues that section 9 does immunize negligent medical care and treatment performed as part of a child abuse investigation.  Dr. Winny argues that a physician necessarily provides care and treatment to a patient in the process of performing such an investigation.

Section 4 of the Act imposes an obligation upon certain individuals, including physicians, school personnel, law enforcement officers, and psychologists, to report suspicions of child abuse to DCFS.  325 ILCS 5/4 (West 1996).  In order to encourage the reporting and investigation of child abuse, the legislature has afforded certain immunities to individuals having a reporting duty under the Act.  At the time in question, Section 9 of the Act provided:

"Any person, institution or agency, under this Act, participating in good faith in the making of a report or referral, or in the investigation of such a report or referral or in the taking of photographs and x-rays or in the retaining a child in temporary protective custody shall have immunity from any liability, civil, criminal or that otherwise might result by reason of such actions.  For the purpose of any proceedings, civil or criminal, the good faith of any persons required to report or refer, or permitted to report, cases of suspected child abuse or neglect or permitted to refer individuals under this Act, shall be presumed."  325 ILCS 5/9 (West 1996).

In construing the scope of the immunities contained in section 9, our primary goal is to ascertain and give effect to the legislature's intention in enacting the statute.  See 
Harinek v. 161 North Clark Street Ltd. Partnership
, 181 Ill. 2d 335, 340 (1998). The best indication of the legislature's intent is the plain language of the statute and we may not depart from the plain language of the Act by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent (
Harinek
, 181 Ill. 2d at 340).  Additionally, immunity provisions must be strictly construed as they are in derogation of the common law.  
Snyder v. Curran Township
, 167 Ill. 2d 466, 477 (1995).

A plain reading of the language contained in section 9 leads us to conclude that the legislature did not intend to immunize a physician for liability arising from negligent care and treatment administered to a patient.  Indeed, section 9 contains no reference whatsoever to the "care and treatment" that a physician provides to his patient.  Rather, at the time in question, section 9 specifically immunized four categories of conduct: (1) the making of a report or a referral, (2) the investigation of such a report or referral, (3) the taking of photographs and X-rays, and (4) the retaining of a child in temporary protective custody.  325 ILCS 5/9 (West 1996).  As the legislature did not include "care and treatment" as a category of immunized conduct, we do not believe that the Act immunizes a physician for acts of medical malpractice that cause personal injury to his patient.  Instead, we believe that the statute immunizes only against damages specifically alleged to have resulted because a report of child abuse was made under the Act or because such a report was investigated.

We further believe that such an interpretation best promotes the purpose of the Act.  Illinois courts have repeatedly noted that the purpose of Act was to facilitate and encourage the reporting of child abuse to DCFS.  
Nosbaum v. Martini
, 312 Ill. App. 3d 108, 117 (2000); 
Lehman v. Stevens
, 148 Ill. App. 3d 538, 544-45 (1986).  During legislative debate on the Act, legislators explained that the purpose of the Act was to encourage the reporting of abuse.  See 79th  Ill. Gen. Assem., House Proceedings, June 13, 1975, at 75 (statements of Representative Barnes) ("The whole concept and the whole idea of recreating the Act was to encourage more people to come forth *** with information to report various kinds of acts that are perpetrated on children").  To accomplish this objective, the Act was intended to provide "immunity for persons participating in good faith in the making of the [r]eport" (79th Ill. Gen. Assem., House Proceedings, June 19, 1975, at 129 (statements of Representative Barnes)).

Viewing the language of section 9 in light of this expressed purpose, we believe that the accorded immunities were intended to protect individuals from damages alleged to have resulted directly from the reporting and investigation of child abuse under the Act.  Such damages might include loss of companionship, mental anguish, libel, slander, or other injury arising from the report of child abuse and/or the removal of a child from his parents.  See 
Pryweller v. Cohen
, 282 Ill. App. 3d 899, 908-10 (1996) (physician was immunized under the Act from cause of action brought by parent alleging emotional damage and loss of affection resulting from removal of child); 
Lehman
, 148 Ill. App. 3d at 551-52 (1986) (physician was immunized under the Act for cause of action by parent alleging slander).  Permitting the recovery of these types of damages against individuals who report and investigate child abuse under the Act would undoubtedly discourage the reporting of child abuse and hinder the accomplishment of the Act's objectives.  In our opinion, it was this problem that section 9 was intended to address.  However, we find no indication, either in the language of the statute or the legislative history, that the Act was intended to shield a physician for liability for medical malpractice.

The only other Illinois court to consider this issue has similarly concluded that the Act was not intended to immunize liability for negligent care and treatment administered to a patient.  See 
Nosbaum v. Martini
, 312 Ill. App. 3d 108 (2000).  In 
Nosbaum
, the minor plaintiff was medically examined by the defendant doctor who found a genital abnormality that the doctor believed was indicative of sexual abuse.  
Nosbaum
, 312 Ill. App. 3d at 111-12.  The doctor's suspicions were reported to DCFS and the child was subsequently removed from her mother's care.  
Nosbaum
, 312 Ill. App. 3d at 112.  Nine months after the doctor's examination, the doctor amended her examination report to reflect that she had made an error regarding the examination equipment and advised that the minor's genitals were normal.  
Nosbaum
, 312 Ill. App. 3d at 112-13.  After a year apart, the child was returned to the mother's care and custody.  The child filed suit against the physician, alleging medical malpractice and seeking damages for mental anguish and loss of the companionship of her mother and stepfather that she suffered during the removal.  The trial court dismissed the complaint, finding that the alleged conduct was immunized under section 9.  
Nosbaum
, 312 Ill. App. 3d at 113.

On review, the appellate court vacated the dismissal and remanded the cause for further proceedings to determine whether the alleged damages arose independently from the physician's misdiagnosis or whether the damages arose from the incorporation of that misdiagnosis into the DCFS report.  
Nosbaum
, 312 Ill. App. 3d at 122.  The court explained that the policy reason underlying the immunities contained in section 9 was to encourage the reporting of child abuse by limiting liability arising from such reporting.  
Nosbaum
, 312 Ill. App. 3d at 117.  The court reasoned that such immunities were not intended to relieve a physician of his duty of care to his patient or to immunize a physician from liability for medical malpractice simply because it might have a link to a child abuse report.  
Nosbaum
, 312 Ill. App. 3d at 119.  The court therefore held that, in instances where it could be shown that the damages claimed resulted directly from a misdiagnosis and not from the DCFS report itself, "there is no reason to extend to that independent malpractice the protection of the statute's immunity provision."  
Nosbaum
, 312 Ill. App. 3d at 119.

We agree with 
Nosbaum
 that the application of section 9 immunity is dependent upon whether the alleged damages arise from the physician's act of reporting and investigating child abuse or whether they arise from an independent act of medical negligence.  These are separate and distinct causes of action, and we agree that the former action falls within the scope of section 9 and that the latter action does not.  Unlike 
Nosbaum
, however, we do not believe section 9 permits a plaintiff to recover for mental anguish and loss of society and companionship simply because of a physician's misdiagnosis of child abuse.  Illinois courts have consistently held that the diagnosis of child abuse is necessarily related to the investigation and reporting of such abuse and is immunized under the Act.  See 
Poulos v. Lane
, 276 Ill. App. 3d 524 (1995); 
Lehman
, 148 Ill. App. 3d 538.  To fall outside the scope of section 9, the plaintiff must allege some sort of personal injury directly arising from negligent care administered by the physician.

Dr. Winny asserts that the administration of medical care and treatment is necessary to investigate a claim of child abuse and that a physician should therefore be immunized for any negligence committed during such an investigation, provided that the physician acted in good faith.  Although we agree that a physician may be providing medical care to his patient in the course of investigating a claim of child abuse, we find no indication in the language of the statute that the legislature intended to shield a physician from liability for personal injuries that result from negligent care and treatment merely because such treatment was administered as part of a child abuse investigation.

Indeed, as we review other portions of the Act, it appears that the legislature did not intend to immunize negligent medical care and treatment.  For example, section 5 of the Act permits physicians and other individuals to take a child into temporary custody under certain specified circumstances.  325 ILCS 5/5 (West 1996).  Under such circumstances, the individual taking custody may consent to the performance of emergency medical treatment upon the child.  325 ILCS 5/5 (West 1996).  Section 5 accords immunity for any civil and criminal liability that might be incurred from taking a child into temporary custody.  325 ILCS 5/5 (West 1996).  However, such immunity does not extend to a physician's act of consenting to the administration of emergency treatment upon the child unless the physician is "acting in good faith and in accordance with accepted medical practice."  325 ILCS 5/5 (West 1996).  We believe that such language demonstrates that the legislature did not intend to excuse a physician from his obligation to act in conformity with accepted medical practice.  As the legislature expressly declined to immunize negligent medical care and treatment in section 5 of the Act, we believe that it would be illogical to find that section 9 immunizes against liability for negligent care and treatment.  A court should read all portions of an act in relation to each other and as part of a coherent whole.  
Lake Hinsdale Village Condominium Ass'n v. Department of Public Aid
, 298 Ill. App. 3d 192, 198 (1998).

Our interpretation of the Act is also in harmony with the approach taken by other jurisdictions that have confronted this issue.  Many states have enacted immunity provisions similar to section 9 in order to secure federal assistance grants.  See 42 U.S.C.A. §5106a(b)(2)(A)(iv) (West Supp. 2001).  Courts construing these immunity provisions have concluded that physicians are immune only to the extent that their conduct arises from their duty to report suspicions of child abuse, including diagnosing a child's medical condition, contacting the appropriate authorities, and preparing for and later testifying as to their opinions.  See 
Bryant-Bruce v. Vanderbilt University, Inc.
, 974 F. Supp. 1127, 1141 (M.D. Tenn. 1997); 
Michaels v. Gordon
, 211 Ga. App. 470, 471-72, 439 S.E.2d 722, 723-24 (1993); 
Maples v. Siddiqui
, 450 N.W.2d 529, 530 (Iowa 1990); 
Awkerman v. Tri-County Orthopedic Group, P.C.
, 143 Mich. App. 722, ___, 373 N.W.2d 204, 206-07 (1985).  However, these courts have declined to extend such immunity to shield a physician for negligent care and treatment administered to a patient when such action is taken beyond the statutory reporting requirement.  See  
Bryant-Bruce
, 974 F. Supp. at 1141; 
D.L.C. v. Walsh
, 908 S.W.2d 791, 799 (Mo. App. 1995).  Accordingly, in instances where the physician's acts of negligence are separate and distinct from those acts necessary to form the diagnosis and report child abuse, the immunities do not attach.  See 
D.L.C.
, 908 S.W.2d at 799.

Finally, we do not believe that providing immunity to physicians for liability for personal injuries resulting from medical malpractice would foster the objective of the Act to encourage the reporting of child abuse.  Applying the approach advocated by Dr. Winny, section 9 would immunize a physician who negligently repaired a child's broken leg in the event that the physician suspected that the leg was broken as a result of child abuse and reported the suspected abuse to DCFS.  Similarly, under Dr. Winny's approach, a physician would be immunized for his negligence in failing to observe a cancerous tumor on a child's labia simply because the physician was examining the child as part of an investigation of a report of child abuse under the Act.  See 
Nosbaum
, 312 Ill. App. 3d at 117.  Such harsh results are surely not what the legislature intended in enacting section 9.  Rather, for the reasons discussed above, we hold that the immunities contained in section 9 protect only against damages directly related to the findings made in the course of a child abuse investigation and the reporting of such findings to DCFS.  Accordingly, we answer the first certified question in the negative and hold that the good-faith immunity provided by section 9 does not shield a physician from liability for his failure to meet accepted medical standards in providing care and treatment to his patient.

Turning to the present case, as detailed above, count V of the plaintiff's complaint contained numerous allegations of wrongdoing against Dr. Winny.  Included among these are allegations that Dr. Winny committed medical malpractice when he negligently failed to provide John with appropriate psychological care and treatment.  Specifically, Dr. Winny is alleged to have improperly exposed John to a course of therapy that centered upon satanic themes and that encouraged him to engage in sexual play and sexual contact.  Dr. Winny is also alleged to have failed to properly supervise his medical assistants who were performing therapies upon John.  As a result of such negligence, John's psychological condition is alleged to have been permanently worsened, requiring him to undergo additional lengthy inpatient psychiatric hospitalizations.  We believe that these allegations fall outside the scope of section 9, as they assert a personal injury resulting from acts of medical malpractice committed by Dr. Winny.  As these allegations do not fall within the scope of section 9, it was unnecessary for the trial court to consider whether Dr. Winny acted in "good faith" for purposes of the statute.

Moreover, we note that the plaintiff introduced evidence to support such allegations by submitting the affidavit of her expert, Dr. Cannell.  In his affidavit, Dr. Cannell stated that Dr. Winny rendered psychiatric "treatment" to John and did not merely "evaluate" him.  The plaintiff's expert also stated that such treatment did not meet the accepted standard of medical care.  We therefore hold that such evidence was sufficient to create a question of material fact as to whether Dr. Winny complied with the applicable standard of care and affirm the trial court's denial of the motion for summary judgment with respect to these allegations.

However, count V also contains allegations that Dr. Winny wrongfully diagnosed John as having been exposed to physical and sexual abuse, thereby causing John to be separated from his mother for a period in excess of three years.  As a result, John is alleged to have been deprived of the loving and caring home that he otherwise would have enjoyed.  These damages are directly related to Dr. Winny's investigation and diagnosis of child abuse and his report of these findings to DCFS.  As such, they are specifically immunized by section 9 of the Act.  We therefore believe that Dr. Winny was entitled to summary judgment as to these allegations provided that he acted in "good faith" as required by the statute.  In order to determine whether Dr. Winny acted in "good faith," we must proceed to the legal issue presented in the second certified question.

The second certified question asks whether evidence that a physician failed to meet accepted medical standards is sufficient to create a question of fact over whether the physician acted in "good faith" within the meaning of section 9.  The plaintiff argues that a physician's failure to meet accepted medical standards is a necessary factor to be considered in determining whether a physician acted in good faith.  On the other hand, Dr. Winny argues that evidence of negligence, standing alone, is insufficient to create a question of fact as to a physician's good faith.  Dr. Winny contends that, if the good-faith immunity granted by section 9 can be overcome merely by establishing negligence, then the immunity is meaningless.

As noted above, section 9 accords immunities to any person participating in good faith in the making of a report or a referral or in the investigation of such a report or a referral.  The statute further provides that the good faith of any person required or permitted to report or refer cases of suspected child abuse under the Act is presumed.  325 ILCS 5/9 (West 1996).

No Illinois court has considered the precise question of whether evidence that a physician acted negligently in reporting suspicions of child abuse, standing alone, is sufficient to create a question of fact over "good faith" under section 9.  Several Illinois courts, however, have held that an individual does not act with good faith under the Act when he acts with actual malice, violates the provisions of the Act, or makes a report of abuse when there is no reasonable basis for such a report and the evidence suggests that the report was made for malicious purposes.  See 
Falk v. Martel
, 210 Ill. App. 3d 557, 561-62 (1991); 
Brown v. Farkas
, 158 Ill. App. 3d 772, 778 (1986).

In  
Pryweller v. Cohen
, 282 Ill. App. 3d 899, 909-10 (1996), the plaintiff argued that there was a question of fact as to whether a social worker acted in good faith in making a report when she failed to conduct an appropriate physical examination of the child, to take an adequate history, and because her finding of abuse was contrary to DCFS's final determination and the opinion of the other health care providers.  The court explained that such conduct did not rise to the level of bad faith and concluded that the claims brought against the social worker properly had been dismissed pursuant to the immunity granted by section 9.  
Pryweller
, 282 Ill. App. 3d at 910.

Many of the other jurisdictions noted above have also considered the question of whether a physician's breach of the standard of care in reporting acts of child abuse was sufficient to create a question of fact concerning a reporter's good faith.  These jurisdictions have concluded that such evidence, standing alone, does not raise a question of fact as to a physician's good faith.  For example in 
Maples
, 450 N.W.2d at 530, a physician was accused of malpractice because he misdiagnosed a child's digestive disorder as parental neglect and made a report to the authorities.  The Iowa Supreme Court rejected the plaintiff's contention that such evidence was sufficient to overcome the immunity of that state's child abuse reporting act.  The court explained:

"[W]hen the legislature undertakes to grant immunity from civil liability, we must assume that this is intended to apply to those situations where liability would otherwise exist because of some negligent act or other breach of legal duty."  
Maples
, 450 N.W.2d at 530.

A similar conclusion was reached by courts in Georgia and Wyoming.  See 
Michaels v. Gordon
, 211 Ga. App. 470, 473, 439 S.E.2d 722, 725 (1993)("Bad faith" not simply bad judgment or negligence but implies a dishonest purpose or some moral deviance); 
Elmore v. Van Horn
, 844 P. 2d 1078, 1083 (Wyo. 1992) (stating that immunity may be granted for a physician's negligence in reporting abuse but not for deliberately making false accusations).

In a case not involving a physician, the South Dakota Supreme Court also concluded that evidence of negligence in making a report of child abuse did not constitute bad faith for purposes of that state's reporting act.  See 
B.W. v. Meade County
, 534 N.W.2d 595 (S.D. 1995).  The court explained:

"[N]egligence and lack of good faith are not equivalent.  Simply put, if good faith immunity can be overcome by establishing negligence, then good faith immunity is a meaningless concept as one would have to be free from negligence, and thus not liable in any event, to also avail one's self of the doctrine of good faith immunity.  Acting in good faith denotes performing honestly, with proper motive, even if negligently."  
B.W.
, 534 N.W.2d at 598.

We find the reasoning in these authorities persuasive and agree that the evidence of negligence, standing alone, is insufficient to create a question of fact as to whether an individual acted with good faith as required by the Act.  If the legislature intended to permit the recovery of damages against individuals who negligently make reports of child abuse, then there would have been no purpose to the enactment of section 9.  We decline to adopt an interpretation of section 9 that would make the language of the statute meaningless.  Rather, we believe that a plaintiff must show more than mere negligence to create a question of fact as to a reporter's good faith.  To raise a question of fact, the plaintiff must show that the reporter has acted maliciously, dishonestly, or for some improper purpose.  Accordingly, we answer the second certified question in the negative and hold that evidence that a physician failed to meet accepted medical standards is not sufficient to create a question of fact over whether that physician acted in "good faith" within the meaning of section 9.

In summary, we must again emphasize that section 9 of the Act has no application where the plaintiff alleges personal injury resulting from medical care and treatment administered by a physician.  However, section 9 does immunize a physician for damages arising from the fact that a diagnosis of child abuse was made and that such a diagnosis was reported to DCFS.  In such instances, a physician is protected from liability provided that he has acted in good faith in diagnosing the patient and reporting the information to DCFS.  When liability is predicated solely upon the diagnosis and the report, a physician's good faith is not measured solely by his compliance with the standard of care.  To create a question of fact as to a physician's good faith, the plaintiff must introduce evidence of malice.

With these principles in mind, we again turn to that portion of count V of the plaintiff's complaint alleging damages arising from Dr. Winny's misdiagnosis of child abuse.  Based upon our review of the record, we find no evidence that Dr. Winny acted maliciously or with an improper motive or purpose in his treatment of John.  Although the plaintiff has introduced evidence that Dr. Winny failed to comply with the applicable standard of care, such evidence is insufficient to create a question of fact as to Dr. Winny's good faith.  Therefore, section 9 of the Act immunizes Dr. Winny from liability arising from ths allegations of count V predicated upon his diagnosis of child abuse and John's subsequent separation from the plaintiff.  We therefore reverse the trial court's denial of the motion for summary judgment as to these allegations.  On remand, the plaintiff shall not be allowed to pursue these claims.  However, as discussed above, the plaintiff shall be permitted to pursue those allegations of personal injury resulting from acts of medical malpractice committed by Dr. Winny during his care and treatment of John. 

For the foregoing reasons, both certified questions are answered in the negative.  The order of the circuit court of Du Page County denying the plaintiff's motion for summary judgment is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with the views expressed in this opinion.

Certified questions answered.  Cause remanded.

HUTCHINSON, P.J., and BOWMAN, J., concur.