KAYLEE MANIFOLD ET AL. *v.* KRISTINE D. RAGAGLIA, COMMISSIONER OF CHILDREN AND FAMILIES, ET AL.
(SC 17150)

Sullivan, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

Argued October 20—officially released December 28, 2004

*Thomas C. Simones*, with whom was *Timothy A. Bishop*, for the appellants (plaintiffs).

*Dana M. Horton*, for the appellees (defendant Robert Creutz et al.).

*Carolyn Signorelli*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Maite Barainca*, assistant attorney general, for the appellees (named defendant et al.).

*Opinion*

NORCOTT, J. The sole issue in this appeal is whether a physician who is not the initial reporter of suspected child abuse, but who performs a medical examination of a child at the request of the department of children and families (department) to determine whether reasonable cause exists to suspect child abuse, is entitled to the immunity from liability provided by General Statutes § 17a-101e (b).[1] The plaintiffs, the minors, Kaylee Manifold (Kaylee) and Matthew Manifold (Matthew), and their parents, Billie Jo Zaks and Michael Manifold (parents), brought this action for, inter alia, negligent infliction of emotional distress, against the following defendants: (1) Kristine D. Ragaglia, individually, and as commissioner of the department, and various department employees (department defendants);[2] and (2)

[1] General Statutes § 17a-101e (b) provides: "Any person, institution or agency which, in good faith, makes, or in good faith does not make, the report pursuant to sections 17a-101a to 17a-101d, inclusive, and 17a-103 shall be immune from any liability, civil or criminal, which might otherwise be incurred or imposed and shall have the same immunity with respect to any judicial proceeding which results from such report provided such person did not perpetrate or cause such abuse or neglect."

[2] The following department employees were named as defendants both in their individual and official capacities: (1) Richard Days, a social worker; (2) Nancy Liebenson-Davis, a social work supervisor; (3) Antonio Donis, a program supervisor; and (4) Daphne Knight, a social worker.

Robert Creutz, a physician, and his employer, William Backus Hospital (William Backus), collectively referred to as the medical defendants. The plaintiffs also brought claims of medical malpractice against the medical defendants. The plaintiffs appeal[3] from the trial court's grant of the medical defendants' motion for summary judgment dismissing counts two, three and four of the complaint. We conclude that a physician who performs a medical examination of a child at the request of the department to determine whether reasonable cause exists to suspect child abuse is entitled to immunity from liability under § 17a-101e (b) for claims arising from that determination. Accordingly, we affirm the judgment of the trial court.

The record reveals the following facts and procedural history. On April 21, 2001, an anonymous caller from the office of the plaintiffs' pediatrician at the Norwich Pediatric Group contacted the department to report that Kathleen Welch, a speech therapist with the Birth to Three Program, had noticed numerous bruises on both Matthew and Kaylee, and a rash on Matthew while she was conducting a home based therapy session.[4] In particular, Welch noticed that both children had bruises

[3] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] At her deposition, Welch testified that, on Friday, April 20, 2001, she had told the parents that she thought they should take Matthew to his pediatrician as soon as possible because she was worried that the bruising and rash might be signs of an underlying medical problem. She explained to them that she was a mandated reporter of suspected child abuse, and that it was imperative that Matthew be seen by a physician. Welch testified that, although the parents seemed agreeable to her suggestion, she contacted their pediatrician's office the following morning to follow up on her concerns. Welch testified that she had attempted to contact the parents during the remainder of the weekend, but was unsuccessful. The next time Welch spoke with the pediatrician's office was Tuesday, April 24, 2001, and the receptionist informed her at that time that the office already had made a report to the department.

in the same location on their foreheads.[5] Matthew and Kaylee were two and three years old, respectively, at this time.

On April 24, 2001 Richard Days, a department social worker, made an unannounced visit to the plaintiffs' home. Days informed the parents of the reason for the visit, and they consented to his examining the children. He noted that both children were dirty and had bruised foreheads, while Matthew also had extensive bruising on his entire back and a rash on the front and back of his torso. Upon questioning by Days, Manifold explained that he had not taken Matthew to the pediatrician because he thought the rash was from Matthew recently having eaten $50 worth of chocolate. Manifold explained to Days that his son bruised easily, and that he had sustained the bruises while roughhousing with his sister and playing with his new toy trucks and the family dog. Later that day, Days accompanied the plaintiffs to the office of their family pediatrician at the Norwich Pediatric Group.

Upon their arrival, Days asked whether Richard Geller, the family's regular pediatrician, could examine the children to determine whether there was reasonable cause to suspect that they had been abused. Geller stated that he was unable to examine the children at that time and that they should not have been brought to his office; he advised Days to take the children to the emergency room at William Backus if an immediate examination was needed. Days then made an appointment with Geller for the following morning, but trans-

---

[5] Welch also reported that Manifold initially had expressed his desire to cancel or postpone the speech therapy appointment, but was dissuaded from doing so because there would be substantial delays in securing another appointment. At Manifold's deposition, he stated that he realized that his son had the bruises and rash, and that he did not want his son's appearance to be "misconstrued" because he had heard some "horror stories" about the department's actions in similar circumstances.

ported the plaintiffs to the William Backus emergency room for a more immediate evaluation.

At William Backus, Creutz examined both children, and ordered an X ray of Matthew. The X ray revealed no fractures, but Creutz stated in the notes of his examination that Matthew had a rash[6] and bruises on his head and chest, as well as three large bruises on his back. The report also noted that Matthew had bruises on his legs, knees, thighs and both buttocks. The parents told Creutz that the bruises were the result of roughhousing with the dog and his sister, as well as a fall. Both parents denied causing the injuries, and told Creutz that no one ever had struck Matthew, except for "pats on the bottom."[7] On the basis of the number and size of the bruises, Creutz concluded, however, that the bruises were typical of inflicted, rather than accidental, injuries, and he recommended further investigation of the injuries' source. He testified at his deposition that he did not order any blood tests to determine whether a blood disorder contributed to the bruising because the physical findings alone raised a sufficiently high suspicion of child abuse to require that it be ruled out, even if the blood test result was positive.

Creutz explained the results of the examination to Days, who in turn discussed them with other department personnel. Shortly thereafter, Jorge Osorio, a department supervisor, authorized a ninety-six hour hold of the children pursuant to General Statutes § 17a-101g (d). The children then were taken into department custody with the assistance of local police, and were placed in a licensed foster home. The department subsequently applied for and obtained orders of temporary

---

[6] Creutz testified at his deposition that the rash was actually petichiae, which are skin discolorations that may be caused either by trauma or platelet abnormalities. Creutz stated that they could have been caused by squeezing the child, but not from eating a lot of candy.

[7] The parents stated similarly with respect to Kaylee.

custody of the children from the Superior Court for Juvenile Matters, *Driscoll, J.*, on April 25, 2001.

On April 25, 2001, Days met the children and the foster mother at the office of the Norwich Pediatric Group. At that time, Nancy Cusmano, a pediatrician, examined both children. Cusmano ordered blood tests for Matthew, stating that a normal blood test would indicate a high probability of abuse. Upon receiving the results of the test, however, Cusmano informed Days that Matthew's blood test showed some abnormalities, including a very low blood platelet count that generally causes clotting difficulties. She said that this condition could explain both the bruising and the rash. See also footnote 6 of this opinion. Cusmano referred Matthew to Joseph McNamara, a hematologist at Yale-New Haven Hospital (Yale), for further evaluation. Thereafter, McNamara diagnosed Matthew with idiopathic thrombocytopenic purpura, a blood disorder, and admitted him to Yale for treatment. The following day, April 26, 2001, McNamara advised Days that the marks and bruising were consistent with the blood disorder. Matthew subsequently was discharged from Yale. In light of this new information, the court granted the department's motion to vacate the orders of temporary custody. The department returned the children to the parents' custody later that same day, and Days relayed the Yale discharge instructions to them.

The neglect petitions that were filed with the court on April 25, 2001, however, remained active, although the department amended them to remove the initial allegations of physical abuse. The case was transferred to the department's division of protective services for further monitoring and study. A social study subsequently was filed with the court, and the neglect petitions were withdrawn in October, 2001.

In April, 2002, the plaintiffs instituted this action. In count one of the complaint, the plaintiffs alleged

numerous acts of malice, negligence and recklessness by the department defendants with respect to the investigation. In count two of the complaint, the plaintiffs alleged that Creutz committed medical malpractice by failing to order a blood test, which resulted in a misdiagnosis of child abuse rather than a blood disorder. In count three, the plaintiffs made claims against William Backus derivative of Creutz' alleged malpractice. In count four, the plaintiffs alleged that the conduct of all the defendants, including the medical defendants, constituted negligent infliction of emotional distress.

Subsequently, the medical defendants moved for summary judgment as to all of the counts against them. The trial court, *Gordon, J.*, granted their motion, concluding that Creutz was entitled to immunity from liability pursuant to § 17a-101e (b) because, as a physician, he was a "mandated reporter" within the scope of that statute. The trial court determined that, as a matter of public policy, Creutz was entitled to the statutory immunity because "we want to protect doctors and other people who we rely on to protect our children to feel free to participate in this often highly charged and potentially legal minefield-like environment . . . ." The trial court noted that, "whether or not [the physician] is a 'mandated reporter' making a determination at the outset in this case or not, he is immune as somebody who is part of the evaluative process of detecting and hopefully averting the mistreatment of children." The court then concluded that William Backus was immune because the claims against it were derivative of those against Creutz, and emphasized that there was no genuine issue of material fact present that would preclude the court from granting a motion for summary judgment in favor of the medical defendants. See Practice Book § 17-49. This appeal followed.[8]

---

[8] We note that the trial court's grant of the medical defendants' motion for summary judgment is an appealable order. Although generally "[a] judgment that disposes of only a part of a complaint is not a final judgment";

On appeal, the plaintiffs claim that the trial court improperly concluded that Creutz was immune from liability under § 17a-101e (b). They contend that, although Creutz is, as a general matter, a "mandated reporter" under General Statutes § 17a-101 (b), and hence entitled to immunity under § 17a-101e (b) when making a good faith error in the initial "reporting" of suspected child abuse, he was not acting in that capacity when he committed routine medical malpractice by failing to order blood tests that would have detected Matthew's blood disorder. Put differently, the plaintiffs claim that Creutz' failure to order the blood test falls outside the scope of the immunity provided by § 17a-101e (b) because his actions did not constitute the "first person report[ing]" of child abuse.

In response, the medical defendants argue that § 17a-101e (b) applies to Creutz because, as a mandated reporter, he was obligated to report his reasonable suspicion of child abuse, regardless of the fact that he had examined the children at the request of the department. The medical defendants also rely on this court's decision in *Zamstein* v. *Marvasti*, 240 Conn. 549, 692 A.2d 781 (1997), and contend that the public policy behind the child protection statutes requires the extension of immunity to physicians who act in good faith and perform independent medical examinations at the behest of the department to determine the existence of a reasonable suspicion of child abuse.

*Cheryl Terry Enterprises, Ltd.* v. *Hartford*, 262 Conn. 240, 246, 811 A.2d 1272 (2002); under Practice Book § 61-3, "a party may appeal if the partial judgment disposes of all causes of action against a particular party or parties . . . ." Id.

We also note that, in addition to appearing as coappellees in this appeal; see Practice Book § 60-4; the department defendants moved for summary judgment with respect to the claims against them on the ground that they were immune from liability pursuant to General Statutes § 4-165. The trial court denied their motion on August 27, 2004, and their appeal from that denial is pending in the Appellate Court.

In the present case, the underlying material facts are undisputed, and "the case distills to an issue of statutory interpretation over which our review is plenary."[9] *Barrett* v. *Montesano*, 269 Conn. 787, 792, 849 A.2d 839 (2004). It is well settled that in construing statutes, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *State* v. *Kirk R.*, 271 Conn. 499, 510, 857 A.2d 908 (2004). Our well settled principles of statutory construction require us to interpret § 17a-101e (b) as it relates to the other child protection statutes, General Statutes § 17a-101 et seq. See, e.g., *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 309–10, 819 A.2d 260 (2003). We note that the text of § 17a-101e (b), both by itself and in relation to other statutes, is silent with respect to the extension of immunity to physicians who perform child abuse evaluations for the department pursuant to the investigation of a report of suspected child abuse. Such silence does not, however, necessarily equate to ambiguity, and we look first to the text of § 17a-101e (b) and the related provisions to determine the legislature's intent. See, e.g., *Carmel Hollow Associates, Ltd.* v. *Bethlehem*, 269 Conn. 120, 133, 848 A.2d 451 (2004); see also Public Acts 2003, No. 03-154, § 1.

We begin our analysis with a review of the relevant statutory language. Section 17a-101 (a) is an express statement of public policy and legislative intent, and provides that: "The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for

---

[9] We note that the plaintiffs appear to claim the existence of an issue of material fact with respect to whether Creutz was acting within the scope of § 17a-101e (b). We, however, disagree with their characterization of this inquiry as an issue of fact. Resolution of this case turns on a quintessential issue of law, namely, the application of an ambiguous statute to undisputed facts.

children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family."

In furtherance of this public policy goal of protecting children from abuse, the statute provides a comprehensive list of persons who are "mandated reporters," many of whom are health care providers, including physicians either licensed in Connecticut or acting as interns or residents at our hospitals. See General Statutes § 17a-101 (b). Thus, the statute prescribes that a "mandated reporter . . . who in the ordinary course of [his or her] employment or profession has reasonable cause to suspect or believe that any child under the age of eighteen years (1) has been abused or neglected . . . (2) has had nonaccidental physical injury, or injury which is at variance with the history given of such injury, inflicted upon such child, or (3) is placed at imminent risk of serious harm, shall report or cause a report to be made [to the department] . . . ."[10] General Statutes § 17a-101a. Indeed, "mandated reporters" who fail to report reasonable suspicions of child abuse are subject to a fine and compulsory participation in an

---

[10] "Mandated reporters" must make an oral report to the department or a law enforcement agency within twelve hours of obtaining "reasonable cause to suspect or believe that a child has been abused or neglected or placed in imminent risk of serious harm . . . ." General Statutes § 17a-101b (a). The mandated reporter then must submit a written report to the department within forty-eight hours of the oral report. See General Statutes § 17a-101c. The required contents of the oral and written reports are prescribed specifically by General Statutes § 17a-101d, and include information necessary to identify and locate the child and the parents or other responsible parties, the age and gender of the child, and other details about the cause, nature and history of the suspected abuse, as well as any interventions taken to "treat, provide shelter or otherwise assist the child."

appropriate training program. See General Statutes § 17a-101a.

To encourage and facilitate compliance with the reporting statute, § 17a-101e provides several protections for persons or institutions who make reports to the department, among which is immunity from civil or criminal liability. Specifically, § 17a-101e (b) provides: "Any person, institution or agency which, in good faith, makes, or in good faith does not make, the report pursuant to sections 17a-101a to 17a-101d, inclusive, and 17a-103 shall be immune from any liability, civil or criminal, which might otherwise be incurred or imposed and shall have the same immunity with respect to any judicial proceeding which results from such report provided such person did not perpetrate or cause such abuse or neglect."[11]

Resolution of the issue on appeal turns, therefore, on whether Creutz was "making a report" of suspected child abuse or neglect as contemplated by the child protection statutes, despite the fact that it was a secondary determination of abuse. We conclude that Creutz' act of describing the result of his examination of the children orally to Days, followed by his provision of a written account of that examination, clearly falls within the common usage of the term "report"; see American Heritage College Dictionary (4th Ed. 2002);[12] which we

_____

[11] Section 17a-101e (a) protects good faith reporters from discrimination or retaliation by their employers. Section 17a-101e (c), however, guards against intentional false reports of child abuse by providing fines or imprisonment for "[a]ny person who knowingly makes a false report of child abuse or neglect . . . ."

[12] Although the legislature did not provide a definition for the statutory term "report," the "word's ordinary meaning," as determined appropriately by review of its dictionary definition; *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, 269 Conn. 672, 682, 849 A.2d 813 (2004); see also General Statutes § 1-1 (a); suggests that Creutz' actions constituted a "report." See American Heritage College Dictionary (4th Ed. 2002) (defining "report," in relevant part, as noun: "1. An account presented usu[ally] in detail"; and as verb: "1. To make or present an often official, formal, or regular account of. 2. To relate or tell about; present. 3. To write or provide an account or summation

construe broadly given the remedial nature of the child protection statutes, § 17a-101 et seq. *In re Shane P.*, 58 Conn. App. 244, 258, 754 A.2d 169 (2000) (concluding that termination of parental rights is remedial); accord *In re Samantha C.*, 268 Conn. 614, 662–63, 847 A.2d 883 (2004) (noting that "termination of parental rights proceedings are not designed to punish parents, but to protect children"). Moreover, neither the mandatory reporting statute; see General Statutes § 17a-101a; nor the immunity provision; see General Statutes § 17a-101e (b); contain any language that either limits their application to *initial* reporters of child abuse, or relieves mandated reporters from their obligation to report suspected abuse because the department may already have knowledge of the child's circumstances. Indeed, the immunity provision applies expressly to "[a]*ny* person, institution or agency which, in good faith, makes, or in good faith does not make, the report . . . ." (Emphasis added.) General Statutes § 17a-101e (b). This is instructive because it is well established that we will not supply an exception or limitation to a statute that the legislature clearly intended to have broad application. See *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 119, 830 A.2d 1121 (2003); see also *Ames* v. *Commissioner of Motor Vehicles*, 267 Conn. 524, 531, 839 A.2d 1250 (2004) (noting that word "any" "can have a variety of meanings . . . [which] depends upon the context and subject matter of the statute" [citations omitted; internal quotation marks omitted]). Accordingly, we conclude that a physician who performs a child abuse evaluation at the request of the department is a reporter who is entitled under § 17a-101e (b) to immunity from liability for claims arising from that determination.

of for publication or broadcast. 4. To submit or relate the results of considerations concerning. 5. To carry back and repeat to another").

This construction of this statute extending immunity to physicians who are secondary reporters performing child abuse evaluations for the department effectuates the express legislative purpose behind the relevant child protection statutes, namely, "to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family" in order "[t]o protect children whose health and welfare may be adversely affected through injury and neglect . . . ." General Statutes § 17a-101 (a). Indeed, in *Zamstein* v. *Marvasti*, supra, 240 Conn. 558–64, this court both recognized the importance of the immunity provision to the reporting statutes and the danger of thwarting these public policy goals by placing limitations on that immunity. In *Zamstein,* the plaintiff parent was falsely accused of and tried on charges of sexual abuse as the result of an interview of his children conducted by the defendant psychiatrist.[13] Id., 551–52. The plaintiff then brought an action against the defendant claiming, inter alia, negligence in the conduct of the examination and aiding of the prosecution. Id., 552. The plaintiff also alleged negligent infliction of emotional distress. Id. The trial court granted the defendant's motion to strike the complaint. Id., 552–53. On appeal, this court affirmed, con-

---

[13] We discuss the facts in *Zamstein* briefly to provide context for our discussion of the court's reasoning in that case. During proceedings to dissolve their marriage, the plaintiff's wife accused him of sexually abusing their children; he was then arrested and prosecuted. *Zamstein* v. *Marvasti,* supra, 240 Conn. 551. At the same time, the plaintiff's wife brought the children to the defendant for a sexual abuse evaluation. Id. He met with the children and videotaped each session. Id. The plaintiff's complaint alleged that the defendant then provided copies of those videotapes for use in the criminal proceedings; the defendant, however, had deleted exculpatory material from the videotapes prior to providing them to the prosecutor. Id., 551–52. After a three month trial wherein the defendant testified for the state, the plaintiff was acquitted of the sexual abuse charges. Id., 552. The plaintiff "alleged that the state's attorney's prosecution of the plaintiff would not have continued but for the defendant's provision of the edited videotapes." Id.

cluding that as a matter of public policy, a mental health professional performing a sexual abuse evaluation owes no duty of care to the alleged abuser. Id., 559. The court relied on the mandated reporter statutes, including the immunity provision, as evincing the "strong public policy of encouraging medical professionals and other persons to report actual and suspected child abuse to the appropriate authorities and agencies." Id. The court discussed the policy behind the immunity statute and cautioned that "imposing a duty on mental health professionals . . . would carry with it the impermissible risk of discouraging such professionals in the future from performing sexual abuse evaluations of children altogether, out of a fear of liability to the very persons whose conduct they may implicate. Such a result would necessarily run contrary to the state's policy of encouraging the reporting and investigation of suspected child abuse . . . because effective evaluation and diagnosis of children is a necessary component of discovering the abuse in the first instance."[14] Id., 560–61.

Indeed, our construction of § 17a-101e (b) as extending immunity to secondary reporters of abuse also is consistent with the legislature's recognition of the important roles of medical professionals in the investigation of child abuse.[15] For example, under Gen-

_____

[14] The court acknowledged in *Zamstein* "that persons falsely charged with sexual abuse of children on the basis of incorrect evaluations may suffer great harm in both their social and personal relationships, and that such accusations have the potential of causing serious damage to a person's reputation." *Zamstein* v. *Marvasti*, supra, 240 Conn. 564. The court, however, nevertheless concluded that the greater social harm would be allowing the sexual abuse of children to go undetected. Id.

[15] We note briefly that the legislative history of the immunity provision, while silent with respect to the precise issue in the present case, does, however, demonstrate the legislature's awareness of the importance of the medical community's role in the child abuse investigation and reporting process, and the health care professionals' reluctance to be involved in the process in the absence of immunity from liability. Section 17a-101e (b) initially was enacted in 1965 as § 3 of Connecticut's first mandatory reporting statute, Public Acts 1965, No. 580, and applied only to physicians and surgeons. Moving for passage of the bill that was enacted as Public Act 580,

eral Statutes § 17a-101f,[16] physicians examining children "with respect to whom abuse or neglect is suspected [may] . . . keep such child in the custody of a hospital

Senator Gloria Schaffer remarked that mandatory reporting was "vital to both the health and the welfare of the children of our state" because many cases of child abuse were seen, but unreported by physicians. 11 S. Proc., Pt. 5, 1965 Sess., p. 1909. Indeed, undisputed testimony before the legislative committees demonstrated that the medical community considered the immunity provision to be vital to the success of the mandatory reporting statute. See Conn. Joint Standing Committee Hearings, Judiciary and Governmental Functions, 1965 Sess., p. 350 (testimony of legislative chairman of state medical society describing immunity as "essential" and stating that lack of immunity resulted in physicians' reluctance to report suspected abuse cases); Conn. Joint Standing Committee Hearings, Public Welfare and Humane Institutions, 1965 Sess., p. 89 (testimony of commissioner of mental health stating that mandatory reporting legislation "would be entirely ineffective, no matter what the legislation and no matter what the penalties unless there is a provision for exemption from any civil or criminal liability"). Further understanding of the impact of liability fears on the medical community was shown in 1997, when the legislature in Public Acts 1997, No. 97-319, § 12, amended § 17a-101e (b) to allow immunity for physicians and other reporters who "in good faith, [do] not make," such reports. Explaining the change, Representative Ellen Scalettar stated that it was meant to add some "balance" and address the overreporting of child abuse by extending immunity to those who determine in the "exercis[e] [of] their professional judgment" that there has been no abuse. 40 H.R. Proc., Pt. 18, 1997 Sess., p. 6594.

[16] General Statutes § 17a-101f provides: "Any physician examining a child with respect to whom abuse or neglect is suspected shall have the right to keep such child in the custody of a hospital for no longer than ninety-six hours in order to perform diagnostic tests and procedures necessary to the detection of child abuse or neglect and to provide necessary medical care with or without the consent of such child's parents or guardian or other person responsible for the child's care, provided the physician has made reasonable attempts to (1) advise such child's parents or guardian or other person responsible for the child's care that he suspects the child has been abused or neglected and (2) obtain consent of such child's parents or guardian or other person responsible for the child's care. In addition, such physician may take or cause to be taken photographs of the area of trauma visible on a child who is the subject of such report without the consent of such child's parents or guardian or other person responsible for the child's care. All such photographs or copies thereof shall be sent to the local police department and the Department of Children and Families. The expenses for such care and such diagnostic tests and procedures, if not covered by insurance, shall be paid by the Commissioner of Children and Families, provided the state may recover such costs from the parent if the parent has been found by a court to have abused or neglected such child."

for [up to] ninety-six hours in order to perform diagnostic tests and procedures necessary to the detection of child abuse or neglect and to provide necessary medical care . . . ."[17] Moreover, the department is required to "provide the child [who is in department custody pursuant to a ninety-six hour hold] with all necessary care, including medical care, which may include an examination by a physician or mental health professional . . . . During the course of a medical examination, a physician may perform diagnostic tests and procedures necessary for the detection of child abuse or neglect. . . ." General Statutes § 17a-101g (d). A construction of § 17a-101e (b) that affords immunity to physicians aiding the department in the investigation process encourages medical professionals to help with this highly sensitive task, rather than to avoid a role in this process out of fear of liability when the department arrives at the hospital with a child who potentially has been abused. See *Zamstein* v. *Marvasti*, supra, 240 Conn. 560–61; see also *Ward* v. *Greene*, 267 Conn. 539, 561, 839 A.2d 1259 (2004) (*Palmer*, *J.*, concurring) ("[t]he legislature provided for such immunity because of the highly sensitive, and necessarily discretionary, nature of the reporting requirement").

The plaintiffs contend, however, that our conclusion will have a deleterious effect because it will create "a loophole for medical malpractice committed against the state's children" and always give "a physician in a similar circumstance . . . a second chance to defeat a malpractice claim." We disagree with the plaintiffs' assessment of this holding's effect on malpractice

---

[17] Indeed, § 17a-101f evinces the legislature's understanding that not all suspicions of child abuse will be determined correctly, as "[t]he expenses for such care and such diagnostic tests and procedures, if not covered by insurance, shall be paid by the Commissioner of Children and Families, provided the state may recover such costs from the parent *if* the parent has been found by a court to have abused or neglected such child." (Emphasis added.)

claims predicated on other misdiagnosis or improper treatment.

The immunity afforded to a physician under § 17a-101e (b) is limited to "damages [that] arise from the physician's act of reporting and investigating child abuse," not those that "arise from an independent act of medical negligence." *Doe* v. *Winny*, 327 Ill. App. 3d 668, 678, 764 N.E.2d 143 (2002); id. (construing scope of Illinois immunity statute). The statutory immunity extends only to the determination of whether a child has been abused, not to the diagnosis and treatment of any underlying injuries. Put differently, if the department brings a child with a fractured leg to a physician, and asks the physician to: (1) treat the fracture; and (2) determine whether the child has been abused, the physician's § 17a-101e (b) immunity would be limited to the abuse determination. See id., 680 (rejecting construction of immunity statute that would immunize physician "for his negligence in failing to observe a cancerous tumor on a child's labia simply because the physician was examining the child as part of an investigation of a report of child abuse"). Accordingly, we conclude that, contrary to the plaintiffs' concerns, the extension of immunity to physicians who participate in the investigation and reporting of child abuse does not give them carte blanche to commit malpractice with respect to the diagnosis and treatment of any underlying medical conditions.

We also note that our conclusion accords with our sister states that have considered this issue. Indeed, *Lesley* v. *State ex rel. Dept. of Social & Health Services*, 83 Wash. App. 263, 921 P.2d 1066 (1996), review denied, 131 Wash. 2d 1026, 939 P.2d 216 (1997), is particularly on point.[18] In *Lesley*, day care workers noticed suspicious

[18] See also *Michaels* v. *Gordon*, 211 Ga. App. 470, 471, 439 S.E.2d 722 (1993) (concluding that psychologist who interviewed two children at request of children's services for investigation of possible sexual abuse was entitled to immunity from malpractice liability per statute providing that "[a]ny

marks on the lower back and buttocks of an infant and were unsure whether they were birthmarks or bruises. Id., 266–67. They notified child protective services, whose caseworker called the infant's pediatrician to determine whether the child had birthmarks. Id., 267. The pediatrician's office staff advised her to take the infant to the emergency room because the physician was unavailable. Id. The caseworker and local police then took the child into protective custody and brought her to a hospital for evaluation. Id. In the meantime, the infant's parents informed the police that the infant had normal birthmarks on her back and buttocks, and the police relayed this information to the caseworker. Id. The caseworker did not, however, inform the emergency room physician about what the parents had said about the birthmarks. Id., 267–68. The physician subsequently examined the child and diagnosed the birthmarks as contusions and possible child abuse. Id., 268. He recommended further evaluation by a specialist; the caseworker did not follow up on the suggestion. Id. The child remained in the temporary custody of the department for several days until another physician diagnosed the marks as birthmarks. Id., 271.

---

person . . . participating in the making of a report . . . or participating in any judicial proceeding or any other proceeding resulting [from such a report of suspected child abuse] shall in so doing be immune from any civil or criminal liability that might otherwise be incurred or imposed" [internal quotation marks omitted]), cert. denied, 1994 Ga. LEXIS 529 (February 18, 1994); *Doe* v. *Winny,* supra, 327 Ill. App. 3d 680–81 (concluding that physician who performed psychiatric evaluation of children at request of child welfare department was entitled to statutory immunity for damages "directly related" to diagnosis of abuse in course of investigation, but not for damages stemming from improper subsequent treatment); *Walker* v. *Pollock,* 981 S.W.2d 226, 227 (Tex. App. 1998) (concluding that physician hired by child protective services to perform court-ordered neurological evaluation in child abuse proceeding was immune from malpractice liability under statute providing that "[a] person acting in good faith who reports or assists in the investigation of a report of alleged child abuse or neglect or who testifies or otherwise participates in a judicial proceeding arising from a report . . . of alleged child abuse or neglect is immune from civil or criminal liability that might be incurred or imposed" [internal quotation marks omitted]).

Thereafter, the infant's parents brought an action against the social worker and the physician alleging, inter alia, negligent investigation and medical malpractice. Id., 266. With respect to the physician, the Washington Court of Appeals concluded that the trial court properly determined that he was entitled to qualified immunity under that state's mandatory reporting statute. Id., 280. The court rejected the parents' argument that the physician's acts did not constitute making a report under the applicable statute, which "provides immunity to any person participating in good faith in reporting or testifying as to alleged child abuse or neglect in a judicial proceeding." Id. The court concluded that " 'any person' " encompassed reporters beyond the initial reporter of suspected child abuse; the physician, therefore, was entitled to qualified immunity because there was no evidence in the record that he acted in bad faith. Id., 281.

In light of our conclusion that § 17a-101e (b) immunity is applicable to a physician who performs a medical examination of a child at the request of the department to determine whether reasonable cause exists to suspect child abuse, we turn to the facts in the present case. It is clear that Creutz, a mandated reporter under § 17a-101 (b), examined the children in the "ordinary course of [his] employment or profession" at the William Backus emergency room. General Statutes § 17a-101a. He then complied with § 17a-101a when he relayed his findings, namely, that there was a reasonable suspicion of child abuse, to the department both orally and via written documentation. Inasmuch as the plaintiffs have not alleged that Creutz acted in bad faith during the examination and reporting process,[19] we conclude

[19] Acknowledging that "[i]t is not that the doctor meant to do harm," the plaintiffs argue for the first time in their reply brief responding to the arguments of the medical defendants that their allegations of medical malpractice substitute for or are evidence of bad faith. We decline to reach this argument because it is well settled that arguments may not be raised for

that his actions constituted a report of suspected child abuse protected by § 17a-101e (b), and, therefore, that the trial court properly granted the medical defendants' motion for summary judgment.

The judgment is affirmed.

In this opinion the other justices concurred.

the first time in reply briefs. See, e.g., *Calcano* v. *Calcano*, 257 Conn. 230, 244, 777 A.2d 633 (2001).