In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-2417

CYNTHIA ARCHER,

*Plaintiff-Appellant,*

*v.*

JOHN T. CHISHOLM, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:15-cv-00922-LA — **Lynn Adelman**, *Judge.*

ARGUED JANUARY 6, 2017 — DECIDED AUGUST 29, 2017

Before WOOD, *Chief Judge*, and BAUER and ROVNER, *Circuit Judges*.

WOOD, *Chief Judge*. While Governor Scott Walker was leading the charge for controversial changes to Wisconsin's public union laws, plaintiff-appellant Cynthia Archer was at his side, drafting the law and advocating for its passage. At the same time, the Milwaukee County State's Attorney's Office was investigating allegations of misconduct against Archer and several of the governor's close associates, using

Wisconsin's unique "John Doe" procedure. Archer sees a
connection between the legislative campaign and the John
Doe investigation. She alleges that she was targeted because
of her work on the union bill and her affiliation with Governor
Walker. Although Archer was never charged with
wrongdoing, she filed this section 1983 action against three
prosecutors and three members of the investigative team. The
district court dismissed the case on the basis of immunity. We
affirm.

**I**

As Archer tells it (and that is the perspective we adopt at
this stage), this case is about a top Republican policy staffer
who was dragged unfairly into a criminal investigation by
members of a rabidly political prosecutor's office. The story
begins in 2006, when Archer joined Milwaukee County
Executive Scott Walker's administration as the budget
director for the Department of Administrative Services.
Archer was no government neophyte; she had served before,
usually in Republican administrations. Two years later,
Walker promoted Archer to Director of Administrative
Services. There she played a key role in developing and
implementing Walker's policies. She was well suited for the
work, thanks to her master's degree in public policy and
administration and her policy experience. Walker, a
Republican, launched his bid for governor in April 2009.

In May 2010, with the gubernatorial campaign underway,
Milwaukee County District Attorney John Chisholm's office
began investigating activities in Walker's Milwaukee County
Executive's office. The impetus for the investigation was a re-
port from Thomas Nardelli, Walker's chief of staff, concerning
some money that the county had given to a non-profit and

that had since vanished. Nardelli had reported the missing money to David Budde, an investigator in the Milwaukee D.A.'s office (and a defendant-appellee here), back in April 2009. His report stated that the county had asked the recipient charity to document how the money was spent, but it failed to submit a satisfactory accounting. Nardelli identified the charity's treasurer, Kevin Kavanaugh, as the likely thief.

To get the investigation started, Assistant D.A. Bruce Landgraf asked a state judge to open a "John Doe" investigation into the missing charity funds, although the purpose of his investigation was not limited to that topic. A "John Doe" is a unique Wisconsin device that permits the prosecutor, under the supervision and direction of a judge, to conduct a secret investigation. Wis. Stat. § 968.26; *State ex rel. Two Unnamed Petitioners v. Peterson*, 866 N.W.2d 165, 197–99 (Wis. 2015). After the proceeding is opened, the John Doe judge may issue subpoenas and examine witnesses. *State v. Doe*, 254 N.W.2d 210, 211 n.1 (Wis. 1977). The Wisconsin Supreme Court believes that, if conducted appropriately, the John Doe process "provides much greater protections to the target of an investigation" than other types of investigations, because the supervising judge acts as a check on the prosecutor. *Two Unnamed Petitioners*, 866 N.W.2d at 198. In this case, the petition for the John Doe investigation said that it was "reasonable to expect" that county officials, including those from the county executive's office, would be witnesses.

The John Doe investigation expanded several times as it uncovered evidence of wrongdoing, including illegal campaign fundraising and anomalies in the bidding process for two county projects (a 2009 housekeeping contract and a 2010 lease for agency space at a building known as Reuss Plaza).

The bidding investigation was exploring whether county officials were giving companies associated with Walker's campaign treasurer, John Hiller, an improper advantage. Along the way, D.A. Chisholm's office learned that Archer had communicated with members of Walker's inner circle, including Hiller, about bid proposals. In December 2010, after Walker was elected governor but before he had taken office, the defendants searched Archer's county office pursuant to a search warrant.

By that point, Archer had left her position with the county. Walker had invited her to join his transition team and had appointed her Deputy Secretary of Administration. The deputy secretary job was a high-ranking political position; its head drafted policy and oversaw state departments. Walker hired Archer because of her experience working on his policies in the county office.

Soon after Walker became governor, he began advocating for legislation that would significantly weaken bargaining rights for public sector unions. He announced a legislative proposal in February 2010. Public protests and national headlines followed. At the same time, Archer was playing a lead role crafting legislation. This sort of policy work was not inherent in her position as deputy secretary, but she took the initiative to participate in the drafting and implementation process of what became known as Act 10. She advised the governor and other members of the staff about the bill and became a self-described point person for fielding questions from lawmakers and other officials. The law passed in early March. Recall campaigns targeting some lawmakers and Governor Walker followed.

While the State Capitol was focused on the public union legislation, the John Doe investigation rolled on. By this time, Archer says, the Milwaukee County D.A.'s Office had "bec[o]me a hotbed of pro-union, anti-Act 10, and anti-Walker activity." D.A. Chisholm had been a vigorous opponent of Walker for years, ever since Walker's stint as county executive. (The Milwaukee District Attorney is an elected office, and Chisholm had run as a Democrat.) Archer asserted that Chisholm had promoted Landgraf and David Robles, assistant district attorneys, "at least in part" because they shared Chisholm's political views; she makes the same claim for the three detective defendants—David Budde, Robert Stelter, and Aaron Weiss.

The John Doe investigation, Archer alleges, was a veiled attempt by the defendants to stop Walker and harass his allies. (Although she claims that D.A. Chisholm's office had conducted "a continuous campaign of harassment and intimidation" against Walker's allies since at least May 2010, she alleges facts concerning only the defendants' opposition to Act 10.) All six defendants worked on the John Doe investigation in some capacity. And although the John Doe proceeding was being conducted under the judge's secrecy order, word of it seeped out to the news media. Archer believes that this, too, was the work of the defendants, who leaked information in order to sully Archer's reputation.

The efforts to stop Act 10 failed, and it became law on March 11, 2011. Six months later, the defendants sought and received from the John Doe judge a search warrant for Archer's home in Madison. The application was supported by a 33-page affidavit from investigator Stelter. As relevant here, the affidavit described the investigation and the facts Stelter

believed gave rise to probable cause that Archer and others had violated a handful of laws, including the state's statute addressing misconduct in public office, an ethics code, and the prohibition against solicitation. It also listed the Wisconsin statute under which aiders, abetters, and co-conspirators are treated as principals. Stelter added that Archer had sent notes regarding a contract from her personal e-mail account and had communicated with other Walker allies about the projects. The affidavit identified, as materials to be seized, "all documents, e-mails, records, correspondence, and information" relating to the Reuss Plaza and housekeeping contracts, as well as "any computer or electronic communication device of Archer related to the above including a search of the documents within said computer or device."

The John Doe judge authorized the search warrant on September 13, 2011, and the D.A.'s office executed it early the next day. It was so early, in fact, that Archer was sleeping when officers arrived. Their tactics were rough; they "thunderous[ly] hammered on her front door" and shouted that she had to open it or they would break it down. Archer saw a battering ram on her lawn. Panicked, she ran downstairs and quickly got dressed in the officers' line of sight. When she opened the door, the officers entered with their guns drawn and proceeded to search every nook and cranny. Just after the search began, Archer noticed a reporter standing on the sidewalk outside her home; other reporters showed up later. The search was widely reported.

The search lasted several hours. During this time, the officers prohibited Archer and her partner from leaving the house, even though her partner needed to get to work. Detective Weiss attended and supervised the operation. He

allegedly told Archer that the investigation was "politically charged" and "touched a lot of people." Officers seized Archer's computer and cell phone; when Archer asked to copy her brother's phone number from her cell phone contacts list, the officers refused.

After the search, Archer was interviewed several times, including by Stelter and Budde, as part of the John Doe investigation. She was granted immunity, however, and she never was charged with any crimes. But at least four people were convicted as a result of the investigation, including some members of Walker's staff who had violated state campaign finance and fundraising laws. Walker's former deputy chief of staff, Tim Russell, pleaded guilty to stealing from the charity, and Kavanaugh, the charity's treasurer, was convicted of felony theft.

Those convictions did not exhaust the investigation. Along the way, the D.A.'s office unearthed evidence suggesting unlawful coordination during the recall effort between Walker's gubernatorial campaign committee and "independent" political groups, including the Wisconsin Club for Growth. Based on this evidence, Chisholm's office sought from a Wisconsin judge, and was granted, the authority to begin a second John Doe investigation ("John Doe II"). The second investigation did not concern Archer, but it is relevant to a document preservation issue in this case.

John Doe II led to people outside Milwaukee County; they were beyond the reach of the John Doe II judge. D.A. Chisholm therefore asked Wisconsin's Attorney General, J.B. Van Hollen, to take over the entire matter. Van Hollen (a Republican) declined to do so because of possible conflicts, but he recommended that the state

Government Accountability Board—the nonpartisan body in charge of state elections—take charge. It did so. A former Republican legislator on the Board later observed that the Board had been presented with "credible, hard evidence" of a violation of the law. In addition, the district attorneys for the other counties in which targets of the investigation resided also became involved. Eventually the John Doe II judge appointed a special prosecutor to run the operation.

Targets of John Doe II, including the director of the Wisconsin Club for Growth, brought various lawsuits to try to shut it down. The one that matters for our purposes resulted in the Wisconsin Supreme Court's decision in *Two Unnamed Petitioners*, 866 N.W.2d 165 (Wis. 2015). There, the court held that the First Amendment prohibited the enforcement of Wisconsin's anti-coordination laws against entities such as the Wisconsin Club for Growth. The decision expressly ended John Doe II for the reason that "the special prosecutor's legal theory is unsupported in either reason or law." *Id*. at 179. It ordered the return of all seized items, and the destruction of "all copies of information and other materials" obtained. *Id*. But on December 2, 2015, the court modified its "destroy" directive, ordering instead that all records from John Doe II—including records from the first investigation that were used in the second investigation—be filed with the supreme court clerk; all other copies were to be destroyed. *State ex rel. Three Unnamed Petitioners v. Peterson*, 875 N.W.2d 49, 59–60 (Wis. 2015). The court reasoned that this was necessary to "ensure that the prosecution team would comply with the court's order" to stop the John Doe II investigation. *Id*. at 58. This meant that the records would be available in the event the investigation ever was allowed to proceed, and that they "could also potentially be available for

use in related civil proceedings," if the request and use was "proper under the circumstances." *Id*. at 61. It did not elaborate further.

On July 1, 2015, while the John Doe cases were still before the Wisconsin Supreme Court, Archer filed the present suit against three prosecutors (Chisholm, Robles, and Landgraf, whom we call the Prosecutors), and three investigators (Stelter, Budde, and Weiss, whom we call the Investigators), in their personal capacities, under 42 U.S.C. § 1983. She alleged five constitutional violations: (1) retaliatory investigation, in violation of the First Amendment; (2) unreasonable search and seizure, in violation of the Fourth Amendment; (3) retaliatory arrest, in violation of the First Amendment; (4) false arrest in violation of the Fourth Amendment; and (5) conspiracy to violate civil rights. These actions, Archer argued, caused her great emotional distress, ranging from post-traumatic stress disorder to depression and anxiety, and prompted her to resign from her deputy secretary job in the Walker administration. The investigation left her reputation in tatters, both personally and professionally, and made her the target of public harassment.

In response, the Prosecutors filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and a motion for judgment on the pleadings pursuant to Rule 12(c), invoking absolute immunity and qualified immunity. The Investigators sought judgment on the pleadings on qualified immunity grounds. The six collectively asked the district court to allow them to file John Doe records with that court, so that the documents would be available even if the Wisconsin Supreme Court denied a request to allow their use for the section 1983 action.

The district court decided all issues in favor of the defendants. It granted the Prosecutors' motion to dismiss, reasoning that they were absolutely immune for all their activities done pursuant to the John Doe investigation. It granted the Investigators' motion for judgment on the pleadings on qualified immunity grounds and noted that the Prosecutors also were entitled to qualified immunity. Finally, it granted the defendants' motion to preserve evidence by permitting them to file with the Clerk of the Eastern District of Wisconsin sealed copies of all the materials they had to file with the Wisconsin Supreme Court.

Before us now is Archer's attempt to revive all of her section 1983 claims and to overturn the district court's preservation order.

## II

We consider *de novo* the district court's ruling on qualified immunity in response to a motion to dismiss. *Ewell v. Toney*, 853 F.3d 911, 918–19 (7th Cir. 2017). Motions under Rule 12(c) for judgment on the pleadings also receive a fresh look in this court. *Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011). We read the complaint in the light most favorable to Archer, the non-movant, accepting all of her well-pleaded facts as true and drawing all reasonable inferences in her favor. *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 504 (7th Cir. 2013). To pass muster, Archer's complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has the requisite plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**A**

Archer asks us to hold that absolute immunity does not protect the Prosecutors in this case because they were acting as investigators—not prosecutors—at all times relevant to her claims. The district court was not persuaded by this argument; it placed great weight on the fact that their actions were taken as part of the John Doe proceeding. That meant that some, if not all, of the Prosecutors' actions were conducted under the direct supervision and approval of a judge. As for the execution of the warrant, the district court found dispositive the fact that Archer had not alleged the necessary personal involvement. The former issue is the critical one: whether the Prosecutors are entitled to absolute immunity for their investigation of Archer because it was done pursuant to the John Doe process.

Prosecutors are absolutely immune for actions they undertake in their capacities as prosecutors, even including malicious prosecution unsupported by probable cause. *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976). But absolute immunity does not shield them from liability for actions that are not "intimately associated with the judicial phase of the criminal process," nor does it apply when they are performing non-prosecutorial actions, such as administrative and investigatory activities. *Imbler*, 424 U.S. at 430; see *Buckley v. Fitzsimmons*, 509 U.S. 259, 274–76 (1993); *Burns v. Reed*, 500 U.S. 478, 492–95 (1991). Protection hinges not on the defendant's job title, but on the nature of the function he performed. *Buckley*, 509 U.S. at 268–69.

The Prosecutors argue that all the actions Archer has identified were prosecutorial in nature because they were conducted under the supervision of a judge who, under Wisconsin law, "is to act as a neutral magistrate." *In re Doe Petition*, 750 N.W.2d 873, 884 (Wis. 2008). We have likened John Doe proceedings to grand jury investigations, see *O'Keefe v. Chisholm*, 769 F.3d 936, 943 (7th Cir. 2014); they also proceed under the general supervision of a judge, and prosecutors receive absolute immunity in those proceedings. *Id*. at 273. That said, the ultimate test remains a functional one; the involvement of a judge is not dispositive. See *Buckley*, 509 U.S. at 272–73 (absolute immunity protects "an out-of-court 'effort to control the presentation of a witness's testimony'") (quoting *Imbler*, 424 U.S. at 430 n.32). John Doe proceedings are intended as "investigatory tool[s]" for determining whether a crime was committed and by whom, *State ex rel. Reimann v. Cir. Ct. for Dane Cnty.*, 571 N.W.2d 385, 390 (Wis. 1997), and prosecutorial work historically did not include investigations, see *Buckley*, 509 U.S. at 275–76.

Because they are so unusual, John Doe proceedings do not fit neatly into the categories used in earlier cases. We find it a bit artificial to squash them into either the absolute immunity box or the qualified immunity box, but fortunately, that is not necessary. If qualified immunity is available, it is enough to dispose of the present case. We therefore turn directly to that analysis. See *Sonnleitner v. York*, 304 F.3d 704, 717 n.8 (7th Cir. 2002) (court may affirm on the basis of any ground fairly presented in the record).

**B**

All of the defendants have invoked qualified immunity as an affirmative defense to Archer's claims. "Qualified

immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Although qualified immunity is an affirmative defense, the plaintiff has the burden of defeating it once the defendants raise it. *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013). To do so, the plaintiff must show (1) that the defendant violated a constitutional right, when construing the facts in the light most favorable to the plaintiff, and (2) that the right was clearly established at the time of the alleged violation, such that it would have been clear to a reasonable actor that her conduct was unlawful. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A failure to show either is fatal for the plaintiff's case, and we may begin (and possibly end) with either inquiry. *Id*. at 236.

1

In support of her assertion that her Fourth Amendment rights were violated by the September 14, 2011 search and seizures in her home, Archer attacks both the warrant and the search itself. We address the warrant first, and then the manner in which the search was carried out.

Searches undertaken pursuant to valid search warrants are presumptively valid, see *Franks v. Delaware*, 438 U.S. 154, 171 (1978), and even flawed warrants can help to demonstrate good faith on the part of the officers, see *United States v. Leon*, 468 U.S. 897 (1984). In order to be valid, a search warrant must: (1) be issued by a neutral and disinterested magistrate; (2) establish probable cause that the evidence sought in the warrant will aid in obtaining a conviction of a particular offense; and (3) describe with particularity the things to be

seized and the place to be searched. *Dalia v. United States*, 441 U.S. 238, 255 (1979). Even if one of those elements is missing, an officer is still entitled to qualified immunity if she is acting pursuant to a warrant that was authorized by a judge, and her action is reasonable. *Leon*, 468 U.S. at 920–21; *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986). Only when an officer seeks or obtains a warrant "so lacking in indicia of probable cause as to render … belief in its existence unreasonable," may the officer face liability for damages. *Malley*, 475 U.S. at 344–45.

Archer asserts that the warrant in her case was deficient in all three respects. Her first attack is her boldest: she asserts that the John Doe judge was not "neutral and detached" and that he "rubber-stamped" the warrant and made "no effort to scrutinize the legal or factual basis for the requested warrants and subpoenas." At one point, she questioned whether the judge even read the application or signed the warrant, although she did not repeat this in her amended complaint. Archer also alleges that the defendants somehow knew about the judge's shirking of his responsibility.

Proving that a judge was not "neutral and detached" is difficult to do; such arguments rarely succeed because they demand exceptional circumstances. Wisconsin has a presumption of regularity that attaches to the actions of state judicial officers. See *State ex rel. LaFollette v. Cir. Ct. of Brown Cnty., Br. 1*, 155 N.W.2d 141, 149 (Wis. 1967); *cf. U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) (presumption of regularity attaches to actions of government agencies). But see *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326–28 (1979) (local justice did not act with the required neutrality and detachment when he participated in and directed the seizure of items during the

execution of a warrant he had issued). Archer has offered nothing in her complaint that would rebut that presumption. At best she has expressed a hunch that something went awry. But she must do more than raise questions about the judge's action; she must allege enough facts to present a plausible violation. See *Twombly*, 550 U.S. at 570; *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014).

The only factual allegations that head in this direction—facts which also were not in her amended complaint—concern time sheets and reimbursement logs that the John Doe judge (who was paid by the hour) submitted to the state. Those sheets apparently reflected that he did not report doing work on the John Doe investigation on the date when Stelter submitted his sworn statement and the judge signed the warrant. From these logs, timestamps, and the judge's report of work done some 30 miles away, Archer deduces that there was not enough time in the day for the judge to review Stelter's warrant package. Archer adds a roundabout challenge to the authenticity of the warrant, noting that the judge did not seek reimbursement for travel to Milwaukee (where the warrant was issued), even though he did not live there. Finally, Archer's handwriting expert "was unable to confirm" that the signature on the warrant matched other documents signed by the judge.

These records are not the silver bullet Archer thinks they are; they do not, and cannot show, that the judge was not "neutral and detached." Assuming for the sake of argument that the court should even consider these documents, they reveal at most that the judge did not spend significant time reviewing the warrant on the day that it was issued. It does not

show that he did *not* review a draft or discuss it with the defendants earlier. Nor does it shed light on possible bias or impropriety. It relates only to the judge's diligence, which is irrelevant to our validity inquiry. And it is possible that he did not ask for reimbursement for that day's work. (Indeed, given the ease of today's electronic communication, the judge easily could have been working on the case from an office 30 miles away from Milwaukee; the record is silent about this possibility.) In sum, Archer has failed to allege facts that, if believed, would show that the judge who issued the warrant shirked his responsibility to be a "neutral and detached magistrate." *Coolidge v. New Hampshire*, 403 U.S. 443, 449 (1971).

Archer's theory has another flaw: she has not explained how the defendant prosecutors and investigators might have known of the judge's alleged sloppiness, such that their reliance on the warrant was unreasonable. Archer's brief says only that "[a]ppellees knew that the judge did not review the warrant and know whether he is actually the one who signed it." Why the counter-intuitive proposition that the prosecutor's office should have known about the internal operations of the judiciary is left up in the air.

Archer's second jab at the warrant focuses on Stelter's supporting affidavit. Archer claims that Stelter and others procured the affidavit through deceit by providing misleading and unfair statements to the judge. The defendants, she contends, selectively quoted her e-mails and failed to disclose key information about the bids, including that Archer "actively opposed" awarding the 2010 Reuss Plaza lease to the Walker administration's favored bidder. This information tended to exculpate her, she claims, and thus would have undermined the showing of probable cause.

A warrant is insufficient for Fourth Amendment purposes if the requesting officer "knowingly, intentionally, or with reckless disregard for the truth, makes false statements" when requesting it, and her false statements were "necessary to the determination that a warrant should issue." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (internal citation omitted). This includes an officer's failure to disclose facts that she "knew would negate probable cause." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003). But even officers who knowingly or recklessly submit an affidavit containing falsehoods may receive qualified immunity if they show an objectively reasonable basis for believing that the affidavit still demonstrated probable cause. *Betker*, 692 F.3d at 860.

The facts that were allegedly withheld from the issuing judge do not negate probable cause. Stelter's detailed affidavit described a range of suspicious and troubling activity between bidders and Walker's inner circle, including Archer. It noted that Archer used her private e-mail account to forward documents and, at one point, to advise Hiller. Even if Archer personally opposed a favored bidder, it is still possible that she improperly assisted others. Moreover, the affidavit specifically relied on Wisconsin's parties-to-crime statute, Wis. Stat. § 939.05, which allows for aiders and co-conspirators to be treated as principals to a crime. Because no facts that would negate probable cause were withheld, the warrant cannot be rejected on this ground.

Archer lastly attacks the particularity of the warrant. She claims that it was so lacking in meaningful limits that it was facially deficient and thus did not even permit good-faith, *Leon*-style reliance. The Fourth Amendment demands that

warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. This mandate "makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Marron v. United States*, 275 U.S. 192, 196 (1927); see also *Maryland v. Garrison*, 480 U.S. 79, 84 (1987); *Dalia*, 441 U.S. at 255. Warrants that fail to satisfy this threshold requirement are facially deficient, and executing officers may not rely on them. *Leon*, 468 U.S. at 914. But although warrants must describe the objects of the search with "reasonable specificity," the Constitution does not insist that they be "elaborately detailed." *United States v. Jones*, 54 F.3d 1285, 1290 (7th Cir. 1995) (internal citation omitted).

Archer's characterization of the warrant as containing only "reference[s] to broad statutes" and "illustrative" topics is not supported by the document. Far from giving only a bird's eye view of the case, Stelter's affidavit detailed the contracts, the players involved, their various actions, and the specific state laws he believed that Archer (and others) may have violated.

The affidavit also described the specific location to be searched (Archer's home), and the objects to be seized, which included "all documents, e-mails, records, correspondence, and information relating to" the Reuss Plaza lease and the 2009 housekeeping contract, and related e-mails between January 1, 2009 and December 31, 2010. Archer finds these categories so broad as to violate the Constitution. But the particularity inquiry turns on what was realistic or possible in *this* investigation. See *Jones*, 54 F.3d at 1291. Stelter could not know *ex ante*, with pinpoint specificity, what documents and e-mails existed. This is to be expected, since secrecy is often

the preferred *modus operandi* of wrongdoers, and the defendants believed Archer and her confederates were wrongdoers. When granular detail is impossible, generic descriptions of the items to be seized are sufficient so long as they particularize the types of items to be seized. *Russell v. Harms*, 397 F.3d 458, 464 (7th Cir. 2005). The warrant here did just that, and thus the defendants are entitled to qualified immunity on this aspect of Archer's unreasonable search and seizure claim.

Archer also argues that the manner of the search violated her Fourth Amendment rights, even if the warrant itself was sound. Archer contends that the officers exceeded its scope by ordering that certain places in her home be searched, because the items the warrant authorized to be seized could not have been in these places. She also objects to the officers' seizure of her phone, computer, and private e-mails—items that, we assume, contained more than documents related to the two contracts and the John Doe investigation. One can raise this type of claim as a matter of law: exceeding the scope of a warrant violates the Fourth Amendment; it is tantamount to a "general exploratory rummaging through one's belongings." *United States v. Mann*, 592 F.3d 779, 782 (7th Cir. 2010).

But the officers did not look for anything the warrant did not authorize, and we already have found that the list was not impermissibly vague. The affidavit expressly permitted the seizure of "any computer or electronic communication device of Archer containing any records related" to the two contracts and the other components of the investigation. The fact that these electronic devices contained documents other than those authorized for seizure under the warrant is of no moment. If the possible existence of unrelated materials were

enough to invalidate a warrant, computer searches would be impossible in drug cases, financial fraud cases, internet child pornography cases, and a host of others. The target's privacy interest in unrelated materials is typically addressed by the search methods used by the police after seizure, because an *ex ante* screen is impossible. Here, Stelter's affidavit specifically noted the officers' desire to "search … documents within" any computer or device that was seized. Because the records authorized to be seized "could be essentially anywhere on the computer," the officers were entitled to take any storage devices capable of holding responsive records.

Moreover, no Fourth Amendment violation occurred when officers searched Archer's dresser, cabinets, and basement. Generally, officers are entitled to search anywhere the items to be seized might likely be discovered, so long as that is within the place authorized to be searched. See *United States v. Ross*, 456 U.S. 798, 820–21 (1982); *Mann*, 592 F.3d at 782–83. The objects of the search set the boundaries of the scope; "[i]f you are looking for an adult elephant, searching for it in a chest of draws is not reasonable." *Platteville Area Apt. Ass'n v. City of Platteville*, 179 F.3d 574, 579 (7th Cir. 1999). Here, the items expressly authorized to be seized—paper, digital records, and electronic devices—were closer in size to a cat than an elephant. Digital records could be stored on devices such as thumb drives, hard drives, or CDs, which could be almost anywhere in the house. Thus, the officers were authorized to look in any of those places. See *United States v. Aghedo*, 159 F.3d 308, 311 (7th Cir. 1998).

Archer also objects to the manner of the search, which she describes as so violent that it independently violated the Fourth Amendment. See *Los Angeles Cnty. v. Rettele*, 550 U.S.

609, 614 (2007) ("Unreasonable actions include the use of ex-cessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time."). She points to the presence of a battering ram (that was not used), the officers' entering the home with "guns drawn" (they apparently put them away quickly), the presence of a news reporter (who was on the sidewalk during the search), and the time of day (early on a weekday morning).

The Fourth Amendment prohibits the use of excessive force during a seizure. See *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Estate of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010). *Rettele* holds that "[t]he test of reasonableness [of force] is an objective one." 550 U.S. at 614. We look at the facts from the perspective of a reasonable officer at the time. *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009). Unpleasant as the events undoubtedly were, we see nothing objectively unreasonable in what occurred. Although Archer was undoubtedly startled to wake up to armed police at her door with a battering ram in the yard, they never used that device, and they quickly holstered their guns. Apprehension that the police *might* do something falls short of a showing that they actually did use objectively abusive tactics. We take Archer at her word that the officers' demeanor was rude and that they were disrespectful, but the Supreme Court has never held that the Fourth Amendment protects against those problems.

The presence of a news reporter outside her home during the search does not change things. Archer alleges no facts tending to show that any of the six defendants were the ones who leaked, or authorized the leak of, information about the search (or anything else about the investigation) to the media. And even if they did, we doubt that the Fourth Amendment

protects against such behavior. That does not mean that abuses must go un-redressed: Wisconsin law provides a remedy for violations of a secrecy order of a John Doe proceeding, which is at the core of Archer's complaint here. See Wis. Stat. § 968.26(4)(d).

2

Because the warrant was valid and Archer has stated no claim about the execution of the search, her false arrest claim also fails. As Archer implicitly acknowledges, officers may detain the occupants of a location to be searched when they execute a valid warrant if they have a valid reason for doing so—that is, an articulable basis for suspecting criminal activity and a valid law enforcement interest. *Michigan v. Summers*, 452 U.S. 692, 704–05 (1981) ("If the evidence that a citizen's residence is harboring contraband sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home.") The defendants did not exceed this limited authority by detaining Archer for the duration of the search. *Id*. (As for Archer's partner, it is enough to say that we have no claim from the partner before us, and so no reason to comment on the separate interests of the partner.) Seeing no merit in Archer's Fourth Amendment arguments, we move on to her First Amendment claim.

3

Archer argues that the investigation and her detention during the search violated her First Amendment rights, because the defendants allegedly took these actions in retaliation for her support of Walker and her advocacy for Act 10.

Once again, we consider whether qualified immunity protects some or all of the defendants. The defendants have properly raised this defense, and so it is up to Archer to show (1) that the defendants' actions (if proven) violated her constitutional rights, and (2) that these rights were clearly established at the time in question. See *Pearson*, 555 U.S. at 236–38.

To state a First Amendment retaliation claim, Archer must allege that: (1) she engaged in activity protected by the First Amendment; (2) she suffered a deprivation that would likely deter First Amendment activity; and (3) the protected activity she engaged in was at least a motivating factor for the retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009); see *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). We proceed on the assumption that Archer's allegations of severe emotional distress, tarnished reputation, and professional harms were enough to satisfy the second element, and that her allegation that the defendants were motivated to investigate her because of her political advocacy met the third (for purposes of pleading—nothing has been proven yet, of course).

That leaves us with the first question—whether the First Amendment protected Archer's activity from the defendants' criminal investigation and her detention during the search. Archer says yes, and directs us to *Rakovich v. Wade*, 850 F.2d 1180 (7th Cir. 1988) (en banc) *abrogated in part on other grounds*, *Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004). *Rakovich*, she argues, stands for the proposition that an investigation conducted in retaliation for public statements is actionable under section 1983. That case concerned a civil service commission member who alleged that he was subjected to a retaliatory in-

vestigation by police officers after he criticized the department. *Id.* at 1183. Archer clings to one line as support for her position: "[t]he district court correctly found that an investigation conducted in retaliation for comments protected by the first amendment could be actionable under section 1983." *Id.* at 1189.

The quote is accurate, but the conclusion she draws is flawed. *Rakovich* is long in the tooth, and the Supreme Court has spoken to the issues surrounding public employee speech since it appeared. The Court has emphasized the distinction between speech a public employee makes in her capacity as a citizen and speech she makes in her capacity as an employee. *Garcetti v. Ceballos*, 547 U.S. 410 (2006). In *Garcetti*, the Court held that First Amendment protection for a public employee's speech turns on two inquiries: (1) whether the employee spoke as a citizen on a matter of public concern; and (2) if so, whether the governmental entity has offered an adequate justification for its decision to treat the employee differently from the general public. *Id.* at 418. Drawing a distinction between public and private speech may be difficult. *Id.* at 424.

That task is necessary, however. Here we must determine whether the activity Archer claims was the impetus for the retaliation was work-related. In her brief in this court, Archer points to several facts: her general advocacy on behalf of Act 10; her policy work for the governor; and her affiliation with and personal support of the governor. But her amended complaint focuses on alleged retaliation for her work surrounding Act 10—legislation that Governor Walker first proposed in February 2011, months *after* the John Doe investigation began and two months *after* investigators searched Archer's office.

There is nothing in the complaint to suggest that Archer's personal support of Governor Walker played a role in the investigation. And Archer cannot duck this inquiry merely by repeating that her work on Act 10 was speech she made "as a citizen … outside the duties of employment." See *Tamayo v. Blagojevich*, 526 F.3d 1074, 1092 (7th Cir. 2008) (rejecting a similar classification as a legal conclusion). This legal conclusion is belied by Archer's other assertions about her legislative work in the Walker administration. Her job was in part to develop policy. Even if this work was "not inherent" to the deputy secretary position, that does not mean Archer undertook it in her capacity as citizen. Thus, while political work and legislative work easily constitute matters of public concern, Archer worked on these matters as a state employee, albeit one who served at the governor's pleasure.

Were we to proceed to the second *Garcetti* inquiry, we would run into a roadblock there too, because that question asks whether the *government employer* had an adequate justification for treating the employee differently from a member of the public. 547 U.S. at 418. *Garcetti* concerned an allegation of employer-employee retaliation. Concerns unique to the employer-employee context infuse the Court's opinion. *E.g., id.* at 410–11 ("Without a significant degree of control over its employees' words and actions, a government employer would have little chance to provide services efficiently."). Archer's case is different: it focuses on the relation between a state employee and a criminal investigation.

It is not at all clear how *Garcetti* would apply to such a situation. In *Fairley v. Andrews*, 578 F.3d 518, 524 (7th Cir. 2009), we observed that *Garcetti* focused on the nature of the defendant, which was a government *employer*, and so we thought

that it was possible that Court might treat differently a case in which retaliation occurs at the hands of coworkers. Yet we went on to hold in *Fairley* that *Garcetti* broadly holds that "the first amendment does not protect statements made as part of one's job." *Id*. at 522.

In sum, *Garcetti* might support either side: Archer, because the defendants were not her employer; the defendants, because Archer's activities were part of her job as a public employee. This uncertainty means that Archer has not shown that her asserted right was "clearly established"—a stringent standard that demands that "every reasonable official would have understood that what he is doing violates that right." *Reichle*, 566 U.S. at 664 (quotation marks omitted); see also *Wilson v. Layne*, 526 U.S. 603, 615 (1999) ("[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."). Our conclusion is bolstered by the Supreme Court's observation in *Hartman v. Moore*, 547 U.S. 250 (2006), where it said that "[n]o one here claims that simply conducting a retaliatory investigation with a view to promote a prosecution is a constitutional tort. … Whether the expense or other adverse consequences of a retaliatory investigation would ever justify recognizing such an investigation as a distinct constitutional violation is not before us." *Id*. at 262 n.9.

Were this all not enough, the existence of probable cause and the judicial supervision of the John Doe investigation further counsel in favor of finding that qualified immunity applies. No case we have seen has considered how to treat public employee speech that draws the attention of a John Doe judge or a grand jury for purposes of the First Amendment. See generally *Branzburg v. Hayes*, 408 U.S. 665 (1972) (no First

Amendment privilege for newsman to refuse to testify before a grand jury). And we know from *Hartman* that probable cause (or the lack thereof) is relevant to a claim of retaliatory prosecution. See 547 U.S. at 260–64. There is no clearly established rule of law under which an official pursuing a lawful investigation, based on probable cause, has been found liable under the First Amendment to a target.

### 4

Because Archer's claims all fail to show the denial of a civil right, her civil conspiracy claim (based on the same underlying conduct) was also correctly dismissed. Section 1983 does not reach a conspiracy to deny a civil right in the absence of an actual denial of such a right. *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982); see also *Hill v. Shobe*, 93 F.3d 418, 422 (7th Cir. 1996).

### C

The only remaining question is whether the district court properly exercised its authority when it agreed that the Clerk of the Eastern District of Wisconsin was to hold copies of the John Doe records undocketed and under seal pending final disposition of this case. At the end of this litigation, the district court ordered these copies to be destroyed. Its action is in some tension with the Wisconsin Supreme Court's file-and-destroy demand in *Three Unnamed Petitioners*, 875 N.W.2d at 58–61. Without the district court's limited preservation order, the defendants feared that they would be unable to obtain access to the records for purposes of their defense in the present case (if we had reversed the district court). The court recognized the comity and federalism concerns raised by the defendants' motion, but it accommodated those concerns in

three ways: by sealing, by making the records undocketed, and by ordering them destroyed at the conclusion of the case.

Archer believes this was an inappropriate intrusion into the Wisconsin Supreme Court's adjudication in *Three Unnamed Petitioners*, because there is no proof that the state's high court will deny any future request from the defendants for access to the documents. Since the state supreme court denied motions to intervene brought by the Prosecutors and the Investigators, we are unable to predict what the court ultimately may decide. We turn therefore to the federal laws on which the defendants rely: the All Writs Act, 28 U.S.C. § 1651, and the Anti-Injunction Act, 28 U.S.C. § 2283.

The All Writs Act allows all courts established by Congress to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Anti-Injunction Act (AIA) bars a district court from granting an injunction to stay a proceeding in a state court unless such action is "expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The AIA recognizes the "fundamental constitutional independence of the States and their courts," and, accordingly, is aimed at ensuring that the dual court systems avoid "needless friction." *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286–87 (1970) (internal citation omitted). The two laws are interpreted similarly. *In re Baldwin-United Corp.*, 770 F.2d 328, 335 (2d Cir. 1985).

We see no problem with the district court's practical solution to this problem of inter-system coordination. Until this case is final, the possibility remains that the defendants will

need to obtain access to the relevant investigation records. Because the Wisconsin Supreme Court has not identified how or whether the defendants will be able to use that court's repository, the district court was justified in creating a means to preserve its ability to adjudicate this case. Thus, the action falls comfortably within the "in aid of" jurisdiction exception to the AIA. Alternatively, it is an order "necessary or appropriate in aid of" the court's jurisdiction for purposes of the All Writs Act. The district court's directive ensures that the stated purpose of the Wisconsin Supreme Court's file-and-destroy order—to remove the records from the Prosecutors' hands— is accomplished. Had the district court proposed a method that conflicted with the Wisconsin Supreme Court's objective, then perhaps we would reach a different outcome. But it does not, and so we see no need to disrupt the district court's handling of the matter.

## III

Although this case presents troubling accusations of a politically motivated investigation, Archer has not met her burden in overcoming the defendants' invocation of qualified immunity. The judgment of the district court is AFFIRMED.