In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1355

ELIZABETH SEBESTA, individually, and as parent and next friend to ELIZABETH MARIE SEBESTA, a minor,

*Plaintiff-Appellant*,

*v.*

ANDREA DAVIS, in her individual capacity, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 7834 — **Gary Feinerman**, *Judge*.

ARGUED SEPTEMBER 14, 2017 — DECIDED DECEMBER 21, 2017

Before WOOD, *Chief Judge*, and RIPPLE and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. A parent has a fundamental right, protected by the Constitution, to "direct the upbringing" of her child. See *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). But like many constitutional rights, this one does not exist in a vacuum. The

state has a strong interest in its most vulnerable citizens, including its children. In order to protect their welfare, states have agencies devoted to the task of child and family protection. Those agencies are staffed by people who must investigate possible abuse of children yet at the same time respect parents' rights. The present appeal raises the question whether certain Illinois state actors impermissibly infringed on a mother's rights as they endeavored to protect her child.

In September 2010, a hospital social worker harbored concerns about Elizabeth Sebesta's ability to care properly for her newborn daughter. The social worker contacted the Illinois Department of Children and Family Services ("DCFS"), which conducted an investigation. Although DCFS employees pressured Sebesta to accept certain at-home services, they never removed Sebesta's daughter from her custody. We conclude, as the district court did, that neither the hospital worker nor the DCFS employees stepped over any constitutional line. They reasonably dealt with a sensitive situation in which they had to decide what would serve the child's best interest. We affirm the district court's grant of summary judgment in their favor.

## I

### A

Our account of the facts is somewhat truncated because a number of the supporting documents have been maintained under seal for a variety of reasons. But we can offer enough to explain our decision. Sebesta had not been doing well a few weeks before she was due to deliver her baby. On September 1, 2010, she sought medical treatment for a physical problem at Swedish Covenant Hospital. It soon was clear that more

than the physical condition was at stake. Sebesta reported that she recently had "trashed" her parents' home and that she had been accused of being suicidal. That report, along with other tests, prompted the hospital to order a psychiatric referral. The psychiatrist provided a diagnosis and recommended that Sebesta be admitted to the inpatient psychiatric unit at the University of Illinois Medical Center ("UIMC").

Sebesta acquiesced in this course of action and had herself admitted to UIMC. While at the hospital, medical staff observed that she was paranoid and angry, exhibited delusions of grandeur, and lacked insight into her illness. Sebesta's history of psychiatric care, including a prior hospitalization, was recorded. After a few days of treatment, she was discharged on September 7. She declined further counseling. On September 26, Sebesta returned to UIMC because she was experiencing labor pains. The next day, she gave birth to her daughter, Elizabeth Marie.

The pediatric team wrote a note to Andrea Davis, a licensed social worker at UIMC, and asked her to look into Sebesta's case. Davis did so, beginning on September 28 with a review of the medical chart, which mentioned Sebesta's mental health diagnosis and a psychotic break earlier in the month. Davis then met with Sebesta and her mother, Soonduck. Davis observed, among other things, that Sebesta was hostile and easily angered; exhibited a lack of insight into her psychiatric needs; fought with her mother; and had refused a toxicology screen of her daughter. Davis recommended that Sebesta seek outpatient psychiatric treatment, but Sebesta rebuffed the suggestion.

Davis became concerned that Elizabeth Marie was at risk of neglect. Under Illinois's Abused and Neglected Child

Reporting Act ("ANCRA"), 325 ILCS 5/4, Davis is in the class
of persons required to report if they have "reasonable cause
to believe a child known to them in their professional or
official capacity may be an abused child or a neglected child."
*Id.* ¶ 1; see also ILL. DEP'T OF CHILDREN & FAMILY SERVS.,
MANUAL FOR MANDATED REPORTERS (May 2015 rev. ed.),
https://www.illinois.gov/dcfs/safekids/reporting/Documents/
cfs_1050-21_mandated_reporter_manual.pdf. Davis believed
that she was facing just such a situation, and so, at the
conclusion of her examination and before Sebesta took her
daughter home, Davis contacted DCFS.

DCFS responded promptly by sending investigator Elysia
Childs to the hospital the next day. Childs interviewed
Sebesta, Soonduck, Davis, and other UIMC staff members,
and she reviewed Sebesta's medical records. Sebesta denied
having any psychiatric history, including prior psychiatric
hospitalizations, other than her recent stay at UIMC.
Soonduck also denied that her daughter had any mental
health problems. A pediatric resident told Childs that Sebesta
lacked insight and was defensive. Childs learned that Sebesta
was refusing medication and counseling. On the positive side,
one physician reported that Sebesta seemed to have a good
attachment to Elizabeth Marie, and another UIMC provider
opined that Sebesta was not a danger to herself or to her baby.

After meeting the next day with her supervisor, Gloria
Bean, Childs informed Sebesta that removal proceedings
would be initiated if Sebesta did not agree to intact family ser-
vices, which involved in-home counseling and child-welfare
services. Feeling backed into a corner, Sebesta agreed to ac-
cept the services. She left the hospital with Elizabeth Marie on
October 1. This was a few days later than Sebesta's discharge

date, because the baby needed to regain weight she had lost post-delivery.

DCFS continued its investigation into Sebesta's parenting. On November 25, DCFS notified Sebesta that she had been "indicated" for a "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect." In English, this signaled that DCFS's investigation had turned up credible evidence of neglect. See ILL. ADMIN. CODE tit. 89, § 300.20. At that point, Catholic Charities took on the task of providing an array of intact family services for Sebesta. Nearly five months later, on April 22, 2011, DCFS "unfounded" the indication against Sebesta—meaning that it was satisfied that no credible evidence of neglect existed. *Id.* Sebesta continued to receive services until May 2011.

B

Believing that she had been wronged by these interferences with her parental rights, Sebesta brought this suit under 42 U.S.C. § 1983 and state common law in 2012 against Davis and the Board of Trustees of the University of Illinois (the University defendants), as well as Childs and Bean (the DCFS defendants). She primarily accused the defendants of violating her federal substantive due process right to familial integrity, by their acts of reporting, investigating, and "indicating" her. She also raised supplemental Illinois tort claims for invasion of privacy and intentional infliction of emotional distress.

In an order issued on January 20, 2016, the district court granted summary judgment for all defendants. It held that Davis was immune from Sebesta's tort claims under Illinois law and did not violate Sebesta's substantive due process

right by calling DCFS. It also found that Childs and Bean were entitled to qualified immunity from Sebesta's section 1983 action. It said little about the liability of the University defendants, but as we must take a *de novo* look at the case, we will address that also. See *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017).

Normally, we would look at both parties' versions of the facts to see if any genuine dispute exists. But there is a wrinkle here. After both sets of defendants moved for summary judgment, the district court set a briefing schedule. Sebesta's attorney requested and received a one-month extension to file her response. The revised due date, October 15, 2015, came and went without a response from Sebesta. It was not until December 2, nearly seven weeks later, that Sebesta's counsel attempted to file a response *instanter*. Acting well within its discretion, the district court rejected the attorney's justification (her busyness) and denied the motion. See *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 883–84 (7th Cir. 2012). As a result, Sebesta never filed any response to the defendants' motions—no legal argument, no statement of facts under Local Rule 56.1(b)(3). In that situation, we continue to approach the facts in the light most favorable to Sebesta, but the only facts before us are the ones alleged in the defendants' Local Rule 56.1(a)(3) statements and the submitted record. See *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015).

## II

We begin with some straightforward observations about Sebesta's effort to sue the University of Illinois's Board of Trustees under 42 U.S.C. § 1983. To the extent that this is an effort to sue the University, it cannot proceed. The University is an arm of the state, and states are not among the "persons"

covered by the statute. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Levenstein v. Salafsky*, 414 F.3d 767, 772 (7th Cir. 2005) (stating that the University of Illinois "is functionally the State of Illinois for purposes of § 1983"). The University's amenability to suit under state law is another matter, but Sebesta's discussion of the University defendants does not develop any independent theory supporting the University's liability, and we regard this aspect of the case as forfeited. To the extent she was trying to sue the individual members of the Board for damages (the only possible relief at this point), she has failed to show the necessary personal involvement on their part. See *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

## III

### A

The next question is whether Davis, who was sued in her individual capacity solely because she reported her concerns to DCFS, enjoys qualified immunity from suit. In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the Supreme Court held that state actors have no constitutional duty affirmatively to protect a child from abuse. *Id.* at 201. But the Court left the door open for states, "through [their] courts and legislatures, [to] impose such affirmative duties of care and protection … ." *Id.* at 202. Illinois has done just this in ANCRA, 325 ILCS 5/1 *et seq.* ANCRA requires a long list of professionals to report to DCFS when they have "reasonable cause" to suspect child abuse or neglect. 325 ILCS 5/4. Presumably to encourage reporting and avoid the chilling effect of possible liability, ANCRA provides civil and criminal immunity to persons who report their concerns to DCFS in

good faith. 325 ILCS 5/9. For the identified mandatory report-
ers, good faith is presumed. *Id.*

Our analysis is somewhat different for the state claims and
the federal claim. We begin with Sebesta's state claims,
because they rise (and as it happens, fall) on the provisions of
ANCRA. As we just noted, the statute itself provides a
presumption of good faith for mandatory reporters. It is thus
the plaintiff's burden, in opposing summary judgment, to
point to evidence that would rebut that presumption. See
*Franciski v. Univ. of Chi. Hosps.*, 338 F.3d 765, 770–71 (7th Cir.
2003); *Lehman v. Stephens*, 499 N.E.2d 103, 112–13 (Ill. App. Ct.
1986).

ANCRA deputizes social workers to report to DCFS when
they have "reasonable cause" to suspect a child is being
abused or neglected. 325 ILCS 5/4. Davis is a social worker,
and so that presumption protects her from Sebesta's state tort
claims unless Sebesta can overcome it. Evidence of mere neg-
ligence will not do the job. *Doe v. Winny*, 764 N.E.2d 143, 154
(Ill. App. Ct. 2002). Rather "[t]o raise a question of fact, the
plaintiff must show that the reporter has acted maliciously,
dishonestly, or for some improper purpose." *Id*. None of the
facts properly before us comes close to meeting that standard.

Sebesta argues that Davis's report to DCFS was improper
because the totality of the information available to her did not
warrant a *reasonable* concern of neglect. She also objects that
the district court relied on information that Davis did not
know at the time of her report. Neither of these arguments
amounts to an accusation of malicious or dishonest intent.

In fact, wholly apart from the statutory presumption, the
record supports a finding of good faith. Davis testified in her

deposition that she thought she was legally required to report the risk of child neglect. Red flags abounded: by the time Davis decided to file her report with DCFS, she had learned of Sebesta's "lack of a support system, her discordant relationship with her mother, her recent psychiatric hospitalization, the potential for exacerbation of psychiatric conditions in the period immediately after giving birth, and the vulnerability of newborn infants … ." *Sebesta v. Davis*, No. 12 C 7834, 2016 WL 232380, at *5 (N.D. Ill. Jan. 20, 2016). Nothing in this record points even to negligence, much less maliciousness or ill will. With respect to Sebesta's state tort claims, Davis is entitled to the immunity provided by ANCRA "from any liability, civil, criminal or that otherwise might result by reason of [a report]." 325 ILCS 5/9.

B

Naturally, ANCRA is not the final word for Sebesta's federal constitutional claim against Davis (for her reporting) or Childs and Bean (for DCFS's follow-up). Sebesta argues that each of them violated her due process right to familial integrity. The Supreme Court has long recognized that the Fourteenth Amendment's protection of liberty applies not only to "freedom from bodily restraint" but also to other fundamental liberty interests such as the right to "establish a home and bring up children." *Meyer*, 262 U.S. at 399. In *Meyer* and later cases, the Court has recognized a constitutionally protected right to freedom from undue state interference with family relations.

In *Meyer*, the Court struck down a statute that prohibited schools from teaching in any language other than English or teaching other languages prior to eighth grade; it relied in part on the parents' "natural duty" to direct their children's

education. *Id.* at 400, 403. The Court returned to this problem in *Pierce v. Society of Sisters*, *supra*, in which it invalidated an Oregon law mandating compulsory public schooling because the statute "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control." 268 U.S. at 534–35. Years later, in *Moore v. City of East Cleveland*, 431 U.S. 494 (1977), the Court struck down a law limiting occupancy to a single family, narrowly defined, as a violation of the Fourteenth Amendment. *Id.* at 506; see also *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (listing Supreme Court cases "recogniz[ing] the fundamental right of parents to make decisions concerning the care, custody, and control of their children").

We have recognized both the existence of, and limitations on, the right to familial integrity in the context of action by child protective services. *E.g.*, *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 928 (7th Cir. 2011). In *Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000), we acknowledged that parental interests in familial integrity must be weighed against the state's interest in protecting children from harm. *Id.* at 1019. In order for their actions to be lawful, child protective service workers must have "some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id*. This "reasonable suspicion" standard is an objective one. *Terry v. Richardson*, 346 F.3d 781, 787 (7th Cir. 2003).

## C

Balancing is notoriously difficult, when (as here) the factors on each side of the balance do not lend themselves to easy measurement. Rather than jumping directly into that process,

we consider first whether Sebesta's suit can surmount a different hurdle: qualified immunity. The qualified immunity doctrine provides defendants immunity from suit, not just a defense to liability. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Though it is an affirmative defense for pleading purposes, the plaintiff carries the burden of showing that defendants are not immune. *Archer v. Chisolm*, 870 F.3d 603, 613 (7th Cir. 2017). She can defeat immunity if she can demonstrate that (1) the defendant violated a constitutional right; and (2) the right was clearly established at the time, so that a reasonable state actor would know her conduct was unlawful. *Id.* We may address these issues in whatever order seems best for the case at hand. *Id.* (citing *Pearson*, 555 U.S. at 236).

The district court, recall, held that Childs and Bean were entitled to qualified immunity because the constitutional injury was not clearly established. It said nothing about qualified immunity for Davis, even though she properly raised this defense in her motion for summary judgment. She has not reasserted an immunity defense on appeal, which raises the possibility of forfeiture. See *Brumfield v. City of Chicago*, 735 F.3d 619, 625 (7th Cir. 2013). Although we could deem that defense forfeited for Davis, it is within our discretion to reach it despite her omission. See *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012) (considering an issue of qualified immunity that defendants properly raised below but not in their appellees' brief); see also *Singleton v. Wulff*, 428 U.S. 106, 121 (1976) (leaving it to the discretion of the courts of appeals whether to consider a question not decided by the district court). Both judicial economy and the merits persuade us not to stand on forfeiture. We therefore turn to the question whether one or more of the three individual defendants are entitled to qualified immunity on Sebesta's constitutional claim.

We are met at the starting gate with a different waiver or forfeiture problem: Sebesta's failure to respond to the defendants' motions for summary judgment. This means, among other things, that she never addressed qualified immunity in the district court. We would be within our rights to regard this as a forfeiture of the point on appeal. See *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014).

Here, too, we think it best to reach the merits rather than rest on forfeiture. There are no disputed issues of fact, and we would like Sebesta to understand our reasoning. Our focus is on the second part of the immunity test—whether the right on which Sebesta relies was clearly established. As the plaintiff, she bears the burden of showing that there is a case "on point or closely analogous" that allows us to conclude that a reasonable government employee would or should know that her conduct is unlawful. *Boyd v. Owen*, 481 F.3d 520, 527 (7th Cir. 2007). Sebesta cites multiple cases to support her position that the three individual defendants should have known they were violating Sebesta's right to familial integrity. But, as is often the case, these cases fail to meet the specificity criteria that the Supreme Court has established. See *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). Though earlier decisions need not be "directly on point," see *Ziglar*, 137 S. Ct. at 1866–67, a look at the four cases on which Sebesta relies demonstrates that none would have alerted a reasonable official to the possibility that her conduct in the situation she confronted was unlawful.

Sebesta first points to *Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000), which articulated the standard for balancing the right to familial integrity against the state's

interest in protecting children from abuse. *Id.* at 1019. She next invokes *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003), which established that unreasonable child-abuse investigations can violate the right to familial relations. *Id.* at 524. She then turns to *Dupuy v. Samuels*, 465 F.3d 757 (7th Cir. 2006) ("*Dupuy II*"), which has been interpreted to announce "that threatening to take action that [one] had no legal authority to take is improper and violates familial rights." *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 484 (7th Cir. 2011) (citing *Dupuy II*, 465 F.3d at 763). Though Sebesta also cites *Hernandez* independently, that case was decided four months after DCFS unfounded the indication against her and thus could not clearly establish any right for the purposes of qualified immunity.

Sebesta asserts that in light of these cases the defendants could not have thought that they had the requisite reasonable suspicion. Their "indication" of Sebesta was based on their concern that her daughter would be in an injurious environment—a subject not specifically included within ANCRA's definition of neglect in 2010. See 325 ILCS 5/3 (2010). Subjecting a child to an environment injurious to her health, physical well-being, or welfare did not enter the statutory definition until 2012. 325 ILCS 5/3 (2012). On the other hand, in 2010 a DCFS regulation did define "neglect" to include injurious environments. ILL. ADMIN. CODE tit. 89, § 300 app. B. The regulation dropped out of the picture only after a later decision from the Illinois Supreme Court, which held that the regulation exceeded DCFS's statutory authority. *Julie Q. v. Dep't of Children & Family Servs.*, 995 N.E.2d 977, 985 (Ill. 2013).

That debate over state law is not important for our purposes. It is impossible to say that the UIMC or DCFS workers

were violating a *clearly* established rule when they acted in accordance with a regulation whose validity demanded the attention of the state supreme court. See *Stevens v. Umsted*, 131 F.3d 697, 707 (7th Cir. 1997) (noting that state laws "do not clearly establish a violation of a constitutional right as required for a § 1983 action"); see also *Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984) ("Neither federal nor state officials lose their immunity by violating the clear command of a statute or regulation—of federal or of state law—unless that statute or regulation provides the basis for the cause of action sued upon."). Furthermore, a decision from 2013 could not have "clearly established" the invalidity of a regulation on which the individual defendants relied in 2010.

Sebesta needed to show that "it would have been clear to [Davis, Childs, and Bean] that the alleged conduct 'was unlawful in the situation [they] confronted.'" *Ziglar*, 137 S. Ct. at 1867 (citation omitted). She has not done so. *Brokaw*, *Doe*, and *Dupuy II* establish only that the state actors needed evidence supporting a *reasonable* suspicion of abuse or neglect in order to report, investigate, and "indicate" Sebesta. Nothing in these cases would have put Davis, Childs, or Bean on notice that their suspicions were unreasonable or their actions unlawful. To the contrary, Davis, Childs, and Bean had a significant amount of evidence supporting a reasonable suspicion of future harm to the baby. They knew that Sebesta had been hospitalized in the wake of what she calls in her brief a "psychiatric break" just weeks before her delivery. On multiple occasions before different providers, she was agitated and displayed a lack of insight. She was observed continually fighting with her mother, with whom she and the baby were supposed to live. She had refused to have a toxicology screen on her baby. They knew that she had denied

having any history of mental health issues and was resistant to counseling. Far from lacking any evidence to support a reasonable suspicion, Davis, Childs, and Bean objectively had more than enough to support a reasonable concern.

Importantly, Sebesta never lost custody of her daughter. At worst, Childs and Bean pressured her to accept intact family services. The services she received from Catholic Charities were in her home and interfered only minimally with her family structure. After approximately six months, she was able to eliminate them altogether.

Sebesta further argues that Childs and Bean ignored clearly established precedent by failing to give sufficient weight to mitigating evidence. See *Dupuy v. Samuels*, 397 F.3d 493, 505–06 (7th Cir. 2005) ("*Dupuy I*"). But *Dupuy I* merely requires DCFS workers to consider exculpatory evidence— not to treat it as dispositive. Sebesta has not identified any point at which Childs and Bean failed to take mitigating evidence into account.

Because Sebesta presents no cases clearly establishing that Davis, Childs, and Bean knew that they were acting unlawfully by reporting, investigating, and "indicating" her, we need not consider whether there was any violation of her constitutional right to familial integrity. The individual defendants are entitled to qualified immunity on her claim under section 1983.

## IV

"[C]hild welfare caseworkers are often called upon to make difficult decisions without the benefit of extended deliberation." *Doe*, 327 F.3d at 525. The state employees here were navigating a sensitive situation, not arbitrarily abusing

their authority. Davis is entitled to ANCRA immunity on the state law claims, and the individual defendants are entitled to qualified immunity on the substantive due process claim. Finally, the case cannot proceed against the Board or its members. We therefore AFFIRM the judgment of the district court.